IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:08MJ 867 |
| | ) | |
| SORIPADA LUBIS, | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Arrikka Drew, being duly sworn, depose, and state as follows:

## I. INTRODUCTION

1.      I am a Special Agent employed by the Immigration and Customs

Enforcement (hereinafter ICE), Department of Homeland Security. I have been a Special

Agent for ICE for approximately four years.  I am assigned to the Washington District

Office, Office of Investigations, in Sterling, Virginia. My duties as a Special Agent

include investigating violations of immigration and customs laws.  I successfully

completed the Criminal Investigator Training Program, the Immigration and Customs

Special Agent Training Program and the Office of Inspector General Training Program at

the Federal Law Enforcement Training Center in Glynn County, Georgia.  I previously

worked for approximately three years as a Special Agent for the Department of

Commerce, Office of Inspector General.

2.      This affidavit is filed in support of an arrest warrant and criminal

complaint charging Soripada Lubis (hereinafter Lubis) with conspiracy to harbor illegal

aliens, in violation of Title 8, United States Code, Sections 1324(a)(1)(v)(I) and

(a)(1)(A)(iii).

3.      This affidavit contains information necessary to support a finding of

probable cause and is based on my personal observations during the course of this

investigation, information conveyed to me by other law enforcement officials, and my

review of records, documents, and other physical evidence obtained during this

investigation. This affidavit does not include each and every fact observed by me or

known by the government.

4.      This case is the result of a joint investigation by ICE and the Federal

Bureau of Investigation (FBI), with assistance from the Department of State, Diplomatic

Security Service (DSS). The investigation began in August 2006, as a result of a letter

sent to the United States Embassy in Jakarta, Indonesia. The author of the letter, written

in the Indonesian language, expresses concern that a female relative was being held by

Lubis at his home in Falls Church.

5.      In sum, the investigation has revealed that Lubis, a native of Indonesia and

naturalized citizen of the United States, resides at a home in Falls Church, Virginia,

where he houses multiple women who lack lawful authority to reside in the United

States. The investigation further reveals that Lubis charges the women a monthly fee and

houses them in his basement during the weekends. Lubis or a conspirator then transports

the women to work in private homes in Maryland, where the women reside during the

week. Later in the week, Lubis or a conspirator transports the women back to Virginia,

where they reside with Lubis and perform work during the weekends. As will be described, women have advised my colleagues and me that Lubis has taken and held their passports, threatened to send them to Indonesia if they fail to comply with his rules, threatened that immigration officials would arrest them, threatened their families overseas, and forbade them from leaving the area. Among other things, the information in this affidavit is based on interviews with the women, surveillance of Lubis and his home and cars, and evidence found in the trash discarded from the home.

## II. PROBABLE CAUSE

### A. Information from CW-1

6.    During the course of this investigation, my colleagues and I interviewed a woman (hereinafter CW-1) who is a native and citizen of Indonesia. I checked CW-1's immigration status in ICE databases. Those show that CW-1 entered the United States on July 1, 2001, with an A-3 visa allowing her to work only for a particular family. According to CW-1, she stopped working for the family who sponsored her A-3 visa and began residing with and working through Lubis in mid October 2001. CW-1 thus violated the conditions of her visa and was no longer lawfully present. Furthermore, at the time of CW-1's entry, she was authorized to remain in the United States only until June 30, 2004. CW-1 remained past that date and in the home of Lubis without extending her status or securing any other lawful status. For reasons that will be described, I further submit probable cause exists to believe Lubis was aware of CW-1's unlawful immigration status.

7.    On August 29, 2008, September 3, 2008, and October 14, 2008, my colleagues and I interviewed CW-1. During those interviews, CW-1 alleged the

3

following.  CW-1 lived with Lubis for approximately six years, along with, at various times, fourteen other Indonesian woman, some of whom slept two per bed in the basement.  CW-1 described a ruse that she devised to allow her to leave Lubis in 2007.  CW-1 said that, at the time of the ruse in 2007, eight other Indonesian women remained in the home of Lubis.

8.      CW-1 further alleged that Lubis held her passport and never returned it to her.  CW-1 said Lubis required the women to follow certain rules, including that they not leave the house (other than for a few minutes to go to the local store or while working) or communicate with people outside the house who were unknown to Lubis.  The women also were not supposed to have cellular telephones, were supposed to be accompanied by someone when outside Lubis's house, and any money sent home to families in Indonesia had to be sent through Lubis and not through another source.

9.      CW-1 also said Lubis told her that she and the other women were illegal and had no rights, and that because she was "illegal" she could not leave the Washington, D.C. area.  As a result of those statements in particular, I submit Lubis was aware that CW-1 and others were unlawfully present in the United States.

10.      CW-1 said that, as of 2007, Lubis charged her and the other women approximately $350.00 per month.  According to CW-1, Lubis also charged the women for food, phone cards, transportation, in addition to collecting money each year for taxes and charging them a fee to send money to their families in Indonesia.  CW-1 stated that a relative of Lubis (hereinafter Co-Conspirator-1) provided one of the women with a list of the amount each woman owed for the month.

11.   CW-1 also explained that, in 2007 to escape from Lubis, she devised a ruse with the assistance of the family whose house she cleaned in Maryland. The plan allowed her to leave Lubis without giving notice to Lubis and without revealing her true destination. The ruse was devised with the goal of avoiding any anger from Lubis as CW-1 was worried Lubis would retaliate against her family in Indonesia. CW-1 explained that Lubis knew where her family resided and had previously threatened her and her family when another woman from CW-1's village escaped from Lubis, namely CW-3. Specifically, Lubis once told CW-1 that if she did anything to him he would have her or her family killed, and that he could easily pay someone to have her family killed in Indonesia. On August 29, 2008, my colleague interviewed the person whose home CW-1 cleaned in Maryland. That woman corroborated CW-1's account of the ruse that allowed CW-1 to break from Lubis. That person also described how CW-1 had become increasingly anxious through the years when the week ended and she was to return to the home of Lubis.

### B. Information Provided by CW-2

12.   On December 18, 2006, June 13, 2007, and June 11, 2008, my colleagues and/or I interviewed an Indonesian woman (hereinafter CW-2), who resided in the basement of Lubis during the weekends for approximately seven months in 2000 and 2001. CW-2 described that Lubis recruited Indonesian women he met at parks or malls, charged them $300 per month, drove them to job sites during the week, and transported them back to his home on the weekends. CW-2 said that seven to eleven other women resided with her in the basement, where they shared cots or beds. CW-2 also described that Lubis restricted their movement, followed them when they left the house, threatened

them and their families in Indonesia, and told them that immigration officials would arrest them if they were found outside of his home. I submit that the threat about calling immigration officials provides probable cause to believe Lubis was aware that at least some of the women were residing unlawfully in the United States.

13.     In addition, CW-2 said that, when they met, Lubis asked about her immigration status and saw her expired visa. I submit, therefore, that Lubis knew that CW-2 was not lawfully present in the United States when he took her to his home and began charging her money to live in the basement.

14.     I have conducted immigration checks to corroborate CW-2's statement that she was did not have lawful immigration status. Those checks reveal that CW-2 was not lawfully present in the United States during the period she claims to have been residing in the basement and paying Lubis each month. CW-2 entered the United States with a B-1 visitor's visa on October 2, 1996, with authority to remain no longer than six months. CW-2 did not extend her status or otherwise attain lawful authority to remain in the United States beyond the expiration of the visitor's visa.

### C. Information Provided by CW-3

15.     On September 24, 2008, my colleagues and I interviewed CW-3 regarding her involvement with Lubis. CW-3 stated that, when she met Lubis, Lubis told her she could earn approximately $1,000 more if she left her employer and moved in with him. CW-3 stated that she left her former employer and moved in with Lubis. CW-3 said that Lubis charged her $320 per month. CW-3 stated she lived with Lubis for approximately one year and eight months during the 2004 to 2006, along with approximately ten other women who slept two per bed in the basement. I believe one of these women was CW-1.

16.    CW-3 said that Lubis held the passport of other women who resided in the home. CW-3 stated that Lubis did not hold her passport because her former employer had her passport. CW-3 said that Co-Conspirator-1 would collect the money Lubis required of the women. CW-3 said Lubis also would collect additional money from the women when Lubis said he had to pay taxes. CW-3 also said Lubis did not allow the women to send money to Indonesia on their own and that he charged a fee to do so. CW-3 stated that Lubis did not allow the women to leave the house without his permission or to talk to other Indonesian people outside the house. CW-3 further stated Lubis threatened to hunt her down if she left him and also threatened to send her back to Indonesia. CW-3 said that Lubis threatened all of the women in the same manner. CW-3 said that, after she left Lubis, Lubis sent his relative (hereinafter Co-Conspirator-2) to scold her family in Indonesia.

17.    I conducted immigration checks to determine the immigration status of CW-3. Those checks reveal that CW-3 entered the United States on August 9, 2001, with an A-3 visa and authorization to remain in the United States only through August 8, 2003. CW-3 violated the terms of her visa when she stopped working for her sponsor and began living with Lubis. Records show that CW-3 has not obtained any lawful status since the expiration of her lawful stay. Therefore, I submit CW-3 was residing in the home of Lubis while lacking any authorized status in the United States.

*D.  Information Provided by CW-4*

18.    On January 29, 2007, a Diplomatic Security Service agent interviewed a woman in Indonesia (hereinafter CW-4). CW-4 said that she worked for Lubis and lived at his house in Falls Church from around mid 2002 to late 2006 and shared the basement

with seven other Indonesia women.  CW-4 provided the fist name or nickname of these women.  Some of these names or nicknames are identical to some of the names or nicknames provided by CW-1, CW-2, and CW-3.

19.    CW-4 stated that she paid Lubis $250 per month, ostensibly for "room and board" for the 8-10 days per month she lived at Lubis's house, plus $10 for each trip to and from the houses she cleaned during the week.  CW-4 said she did not have a social security number while in the United States.

20.    Unlike CW-1, CW-2, and CW-3, CW-4 did not claim that Lubis threatened her or held her against her will.  From my training and experience, however, I know that victims of human trafficking often fear their captors after leaving them, and sometimes lie to protect them.  Despite those denials, CW-4 described that Lubis no longer allowed her to clean the home of a particular family once she failed to return to Lubis's home one weekend.  I submit this suggests Lubis hindered CW-4's freedom of movement.  CW-4 said that women's passports were with Lubis, although she indicated Lubis did not keep the passports from the women.  CW-4 also said Lubis knew he was breaking the law in "employing" the women.

### E.  Evidence Obtained in the Discarded Trash from the Home of Lubis

21.    On multiple occasions, my colleagues and I examined the trash discarded from the house where Lubis housed CW-1, CW-2, CW-3, and CW-4.

22.    Among the trash discarded on September 26, 2008, was a blank envelope containing handwritten notes, including what appear to be five Indonesian names.  Some of those Indonesian names are the names of women whom CW-1 identified as having worked for Lubis and having resided in his basement. In a column to the right of each

8

name is a number.  The number "50" appears after four of the names and the number "30" appears after the other name.  In addition, my colleagues and I arranged to have photographs taken of women being dropped off at the residence on September 3, 2008. CW-1 looked at those photographs and identified three of the women shown in those photographs.  Two of those women's names appeared on the envelope found in the discarded trash on September 26, 2008.  I submit that the envelope and photographs tend to show Lubis continues to house Indonesian women.

23.     On October 3, 2008, trash discarded from the home of Lubis was examined.  The trash included money transfer receipts, including one dated September 16, 2008.  That receipt reflects that Lubis sent $130.00 to a person in Indonesia.  Another receipt is dated September 22, 2008, and shows that Lubis sent $150.00 to a different person in Indonesia.  I submit that the evidence of money transfers tends to corroborate witness information about Lubis sending money overseas for the women in his home.

*F.  Surveillance*

24.     As will be described, my colleagues and I have conducted surveillance of the home where Lubis lives and where he housed CW-1, CW-2, CW-3, and CW-4.  The surveillance shows that Lubis or Co-Conspirator-1 drives the women away from the home at the beginning of the week and returns them to the home at the end of the week. The observed pattern tends to corroborate information from cooperating women and former employers who describe that the women lived in the basement on the weekends and were transported to work at homes in Maryland during the week.

25.     At approximately 8:00 p.m. on May 23, 2008, four women were observed exiting a silver Honda Odyssey with Virginia license plate 9474UW at the home of

9

Lubis. That vehicle is registered to Co-Conspirator-1.

26.    On or about August 1, 2008, my colleague secured photographs of four women returning to the home of Lubis. I showed those photographs to CW-1, who was able to identity three of the four women. CW-1 indicated that she had resided in the basement with those three women.

27.    On or about Friday, September 5, 2008, in Potomac, Maryland, my colleagues and I observed Co-Conspirator-1 driving the 2002, Silver Honda Odyssey, with Virginia license plate number 9474UW. Three passengers were in the van when initially observed. Then the van stopped at a residence in Potomac, Maryland, where one female exited the residence and entered the van. The van then went to another residence in Potomac, Maryland, where one female exited the residence and entered the van. I submit that a total of five passengers were in the van at that time. My colleagues and I followed the van to the final destination, the home of Lubis in Falls Church, Virginia. Five women were seen exiting the van.

28.    In addition to observing Co-Conspirator-1 picking up women in Maryland and driving them to his home in Virginia on September 5, 2008, my colleagues and I also observed similar activity on other days. In particular, on May 23, 2008, my colleague observed the van with Virginia license plate 9474UW arrive at the house of Lubis and let four women out. On May 30, 2008, my colleague and I observed Co-Conspirator-1 drive that same van to the house of Lubis and drop off four women.

### III. CONCLUSION

29.    Based on the above-described facts, I respectfully submit that there is probable cause to believe that, from in and around mid-October 2001 and continuing through the present, in Fairfax County, Virginia, within the Eastern District of Virginia, and elsewhere, Soripada Lubis did unlawfully and knowingly conspire with others known and unknown to conceal, harbor, and shield from detection an alien in any place, including any building and any means of transportation, knowing and in reckless disregard of the fact that the alien had come to, entered, and remain in the United States in violation of the law, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and 1324(a)(1)(A)(v)(I).

### IV. INTENT TO SEEK FORFEITURE

30.    Pursuant to 18 U.S.C. § 982, the Court may direct persons convicted of a violation of 8 U.S.C. §§ 1324(a) to forfeit to the United States any property, real or personal, (1) that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense, or (2) that is used to facilitate, or is intended to facilitate, the commission of the offense.  The United States Attorney's Office has indicated to me that it intends to seek forfeiture against Lubis to the extent the Court authorizes his arrest and he is subsequently convicted of a violation of 8 U.S.C. § 1324(a) or any other offense outlined in this affidavit for which forfeiture is authorized.

<u>Signature and Acknowledgment</u>

Arrikka D. Drew
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me on this 24th day of October 2008,

/s/Thomas Rawles Jones, Jr.
Honorable T. Rawles Jones, Jr.
United States Magistrate Judge
Alexandria, Virginia

12