IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SORIPADA LUBIS, and | ) | No. 1:09-CR-91-GBL |
| | ) | |
| SITI CHADIDJAH SIREGAR, | ) | No. 1:09-CR-92-GBL |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF THE UNITED STATES WITH RESPECT TO
THE SENTENCING OF SORIPADA LUBIS AND SITI CHADIDJAH SIREGAR

The United States of America respectfully submits this sentencing memorandum in connection with the June 22, 2009 sentencing of defendants Soripada Lubis ("Lubis") and Siti Chadidjah Siregar ("Siregar"). In light of the breadth and duration of the defendants' crimes, and the depravity the defendants displayed in exploiting vulnerable immigrants, the United States requests that this Court sentence Siregar to the maximum punishment suggested by the U.S. Sentencing Guidelines. As for Lubis, because of the threats of death and violence Lubis made to the victims, the duration of his criminal venture, and Lubis's sexual abuse of at least two victims, this case is atypical of the usual alien harboring prosecution so as to take Lubis's case out of the heartland of the applicable Guideline provisions. Accordingly, the United States requests that this Court impose on Lubis an upward departure or variance sentence.[1]

---

[1] See United States v. Bonnetti, 277 F.3d 441, 450 (4th Cir. 2002) (affirming the district court's imposition of an upward departure in an alien harboring case based on the lengthy duration of the crime).

To assist the Court in determining an appropriate sentence, this memorandum provides a detailed outline of the facts related by the victims to federal agents. In addition to a discussion of the relevant facts, this memorandum explains how, with respect to Lubis, U.S. Probation erred in the Presentence Report in failing to increase Lubis's offense level by four levels in light of the large number of vulnerable victims under U.S.S.G. § 3A1.1(b)(1) and (2), and failed to increase Lubis's offense level by four levels based on the fact that Lubis was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive, under U.S.S.G. § 3B1.1(a). Thus, properly calculated, Lubis should have an Adjusted Offense Level of 26 and a Total Offense Level of 23.[2]

## I.    Factual Background

Since at least 2000, Lubis and Siregar have harbored Indonesian women in their basement and arranged for these women to work as nannies and housekeepers. Because these women were the defendants' primary source of income, they used threats of force, threats of deportation, and a climate of fear to prevent the victims from leaving. Below is a summary of what each of the victims identified in Lubis's Statement of Facts told federal agents.

### A.    Susi Maedin-Gomez

Like all of the victims, Susi Maedin-Gomez ("Susi") hails from Indonesia. On weekends, Susi lived in Siregar and Lubis's basement from about spring 2000 to about spring 2001.

**Recruitment.** Susi stated that she came to the United States in 1996 with a Saudi diplomat for whom she had been working in Saudi Arabia. In spring 2000, Susi met a Philippine man who

---

[2]  With an Offense Level of 23, the Guidelines suggest a range of imprisonment of 46 to 57 months (3.83 years to 4.75 years).

gave her Lubis's telephone number. Susi called the number and initially spoke with Srimunah Mustakim Umar (a.k.a. "Mona").[3] Lubis later came to Susi's employer's house and promised that if Susi came to work for him, she would make more money than she was currently earning. Susi agreed to work for Lubis and Lubis transported Susi to his house. While driving there, Lubis asked Susi what kind of visa she possessed. Susi replied that it was a tourist visa but that it was expired. Susi knew that she was not allowed to work in the United States with just a tourist visa, and an expired one at that.

**Employment Arranged by Siregar.** While she lived with Siregar and Lubis, Susi worked primarily for one employer, Mr. Daniel Kracov[4] and his wife, Eileen Kracov, who resided around Potomac, Maryland. The Kracovs were friends of Umar's employer Melissa Banner.[5] Umar and Siregar obtained this job for Susi and attended the job interview that Mrs. Kracov conducted.

Susi worked for the Kracov family five days per week and resided in Lubis and Siregar's basement on the weekends. The Kracovs paid Susi around $280 per week. Susi worked for the Kracovs Tuesday through Saturday, 7:30 A.M. to about 7:00 P.M. Every Monday, Lubis transported Susi to the Kracovs and he would retrieve Susi every Saturday night or Sunday morning. On

---

[3] Umar is an illegal alien whom Lubis and Siregar harbored. Umar gradually took on a leadership role in Lubis's organization. She supervised the victims, assisted Lubis and Siregar in finding employment for the victims, and collected the money from the victims.

[4] Susi is unsure of the spelling.

[5] Almost all of the victim's employers were friends of Melissa Banner, who employed Srimunah Mustakim Umar. Lubis and Siregar made Umar one of their deputies and gave her supervisory responsibility over the victims.

Mondays from 10:00 A.M. to 3:30 P.M., Susi cleaned the home of one of the Kracovs' neighbors, the Castellos.

**Unpaid Labor for Siregar.** Before Susi had her Monday job with the Castellos, she assisted Siti Siregar and Ratna Siregar (Siti Siregar's sister, who was another illegal aline harbored by Lubis and Siregar) cleaning houses. Neither Siregar nor Lubis paid Susi for this work.

**Finances and Incidental Expenses.** Susi paid Lubis and Siregar $300 per month, in cash, for rent, food, and transportation. Lubis also required Susi to pay "social security tax." Lubis required that all money sent to Susi's family in Indonesia be sent through him, for which he charged $10 to $20 per transaction. In light of this and other fees, Susi estimates that Lubis and Siregar ended up confiscating between 30 percent and 50 percent of Susi's income.

Of the money she was permitted to keep, Susi sent most of it home to her family. At the time, her brother was dying of cancer and the family desperately needed the money that Susi sent to them. Susi's father is a farmer, but he makes very little money farming, so the family was dependent on Susi's remittances.

**Living Conditions.** Susi lived in Lubis's basement with around ten other women. She shared a "full-size" bed with another Indonesian woman named "Nengsih." Most of the other women also shared beds. Lubis and Siregar did not provide Susi or any other victim a key to the house.[6]

**Threats and Climate of Fear.** Susi stated that she feared Lubis, he often spoke in a mean tone to the women, and he threatened to have disobedient women sent home.

_____

[6] All of the victims have confirmed that, despite paying "rent," none of them had a key to Lubis's house.

THREATENED ABUSE OF THE LEGAL PROCESS.  Lubis frequently told Susi and the other women that they could be arrested by U.S. immigration authorities because the women did not have the proper permits to be in the United States.[7]  He also told them that their former employers might see them and might call immigration authorities.  Susi understood Lubis's threats to be a means of scaring and controlling the women.

THREAT TO SEND VICTIMS BACK TO INDONESIA.  When Lubis was angry, and even sometimes when he wasn't, Lubis would threaten to send disobedient or noncompliant women back to Indonesia.

---

[7]  In her Statement of Facts, Siregar admitted that she and Lubis threatened the victims with deportation:

> The defendant and her husband would periodically warn the Indonesian women that they were not lawfully in the United States and that they would be arrested and deported if American police caught them.

Siregar Stmnt. of Facts ¶ 6.

Threatening deportation is a threatened abuse of the legal process sufficient to constitute the crime of forced labor under 18 U.S.C. 1589(3).  United States v. Kozminski, 487 U.S. 931, 948, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988) (threatening "an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude"); United States v. Calimlim, 538 F.3d 706, 713 (7th Cir. 2008) ("But the immigration laws do not aim to help employers regain secret employees by threats of deportation, and so their 'warnings' about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process. . . .  The warnings therefore fit within the scope of § 1589(3).").

The fact that Lubis and Siregar threatened to find the women if they escaped and his threat to deport them back to Indonesia, therefore, is sufficient to establish threatened abuse of law or the legal process.  United States v. Farrell, 563 F.3d 364, 375 (8th Cir. 2009) (threat to find the workers wherever they went was a threat of legal coercion); United States v. Djoumessi, 538 F.3d 547, 552 (6th Cir. 2008) (evidence that the defendants threatened deportation and the victim labored in fear of deportation is sufficient to establish legal coercion).

THREATS AGAINST FAMILY.  Lubis also threatened Susi that if she made life difficult for him, he would destroy her family.  She understood this to mean that he would kill her family. Whenever Lubis was angry, Lubis would threaten that something could happen to the victims' families.

Susi feared that Lubis might kill or harm her or her family, which is one reason why she stayed with Lubis and Siregar.  She said that she wanted to leave Lubis after three or four months, but Susi felt she was not free to leave.

When Susi finally departed Lubis and Siregar's house, Lubis threatened he would do "something" to Susi's family.  Susi understood this to mean that Lubis would harm her family.

ERRATIC DRIVING.  Susi also mentioned that Lubis would sometimes drive erratically and when doing so he would state that he was going to crash the car and let everyone die.  This, too, terrified Susi.

**Exploiting Islamic and Indonesian Culture.**   According to Susi, Lubis always reminded the women how much he had done for them and how they needed to repay his kindness.  He also tried to make them feel guilty that they had not been sufficiently thankful to Lubis.  Lubis would remind the women that they had a good life now in comparison to when they worked for their Arab employers.

**Lubis's Rules and Restrictions on Freedom.**  Susi related that Lubis placed a number of restrictions on the women:

1.  the victims were not permitted to use public transportation, such as buses or the Metro;

2.  the victims were not allowed to obtain transportation from their employers;

3.  the victims were not allowed to leave Lubis's house without his or Siregar's permission;

6

4.  the victims were not allowed to socialize with anyone who did not live in Lubis and Siregar's house or to even have contact with such people (except for family members in Indonesia);

5.  the victims were not allowed to have boyfriends or to date;

6.  the victims were not allowed to give Lubis's telephone number to anyone and thus could not receive calls at his house;

7.  the victims were allowed to go to the mall for only the period that Lubis designated and only if he or Siregar drove them there; and

8.  the victims could work only for people approved by Lubis.[8]

Susi said she understood that the purpose of these rules was to prevent the victims from leaving Lubis and Siregar. She noted that Lubis and Siregar's two children—Andi and Irna Lubis—were not bound by these rules and that Lubis's daughter, Irna, who is much younger than Susi, had a boyfriend.

**Escape from Lubis and Siregar.**  As noted above, Susi worked for a neighbor of the Kracovs on Mondays. Susi decided to let her friend Nengsih, who also lived in Lubis's basement, take the Monday job. They did not clear this with Lubis, however, and he became enraged when he found out. Lubis called Susi at the Kracovs' house to yell at her. Kracov then drove Susi to Lubis and Siregar's house to get her belongings. This further angered Lubis. Lubis would not allow Susi to go into his house and ignored Susi, a common tactic of his when he wanted to display animosity toward a victim. Ratna Siregar—Siti Siregar's sister, who also resided at the house—called Susi a "dog," which is extremely offensive in Muslim culture because dogs are considered to be extremely

---

[8]  Susi related that an Arabic woman wanted to employ her, but Lubis refused to let Susi take the position.

dirty animals.  Mr. Kracov confronted Siti and Ratna Siregar and they then permitted Nengsih to pack Susi's belongings.  Presumably because Mr. Kracov was present, Lubis did not prevent Susi from leaving.

One week later, Umar telephoned Susi and asked her to come back.  Nengsih, however, had warned Susi that Lubis had purchased a ticket to send Susi back to Indonesia.  Lubis also said he was going to create problems for Susi back in Indonesia.  Indeed, Lubis called Susi's family and accused her of being sexually promiscuous.  In Muslim culture, that is a serious accusation, and Susi's family initially believed Lubis's accusations.

### B.     Tatik Wuryanti Djarno ("Eva")

Eva is an Indonesian woman whose husband and two children still reside in Indonesia.  She resided in Lubis and Siregar's basement on weekends from about fall 2001 to July 2007.

**Recruitment.**  Eva stated that she first came to the United States in July 2001, with a diplomat from Bahrain, for whom she worked as a nanny and housekeeper.  Her contract with the diplomat promised that the diplomat would pay Eva $800 per month, but once in the United States, the diplomat told her she would receive only $300 per month.  When Eva asked to be paid even the promised $300 per month, the diplomat told her she would not be paid anything until she had worked for six months.

One day around October 2001, while Eva was walking with the Bahrainian children in the District of Columbia, Lubis stopped Eva and asked her if she was from Indonesia and how much she was making.  Eva told Lubis that she was supposed to earn $300 per month.  Lubis promised her a better job in which she would make $300 per week.  Lubis gave her some money to call his assistant, Srimunah Mustakim Umar.

Umar told Eva that if she came to work for Lubis she would have to work only five days per week and would have Indonesian friends. Convinced that she would do better with Lubis, one day when the diplomat had taken the children to school, Eva called Umar and asked that Lubis pick her up. Lubis did, and she went to his house in Falls Church, Virginia.

**Work.** Lubis or his wife arranged for Eva to work for a family, the Ottensteins, in Potomac, Maryland. Lubis or Siregar transported Eva and the other women to the homes they were to clean on Monday or Tuesday of each week. Most of these homes are in a neighborhood in the Potomac, Maryland, area. Once dropped off, the women stayed at the client family's home until Friday night or Saturday.

At the end of the week, either Friday or Saturday, Lubis or Siregar would pick them up and the women then spent the weekend at Lubis's house. Eva, for example, stayed in Lubis and Siregar's basement on Sundays and Mondays, and lived at the Potomac, Maryland home of the client family, the Ottensteins, the rest of the time. Lubis generally required the women to return to him at the end of each week, except on a few weekends when a client family requested help on the weekends.

While at the respective client homes in Potomac, the women performed various domestic functions, including cleaning, cooking, and taking care of children. Eva reported that the Ottensteins treated her very well and, indeed, she continues to live and work for them after having escaped from Lubis by leading him to believe she had left the area. Eva said that the hours of work varied, but that generally she would work for various periods between 8:30 a.m. and 8:00 p.m. She estimates that she worked around nine hours per day.

On the weekends, when the women were required to return to Lubis's house, they would also clean Lubis's house and do yard work. They also took turns cooking a communal meal. Lubis did not pay the women for any of this work.

On one of her days off, Monday, Eva worked for Mrs. Ottenstein's brother, Dr. Cohen, cleaning his home. Lubis's wife, Siti Siregar, also worked as a housekeeper and would sometimes require Eva and the other women to help her clean these homes. Siregar did not pay Eva for this work.

**Finances and Incidental Expenses.** According to Eva, she was required to pay Lubis and Siregar approximately one third of the money she earned from the client families. The Ottensteins paid Eva in cash. For example, in 2001, the Ottensteins paid Eva $240 per week. Over time, this was increased to $350 per week so that by 2007, Eva was making $350 per week. In addition, one day a week Eva would clean Dr. Cohen's house in exchange for $100.

In 2007, Lubis and Siregar charged Eva $350 per month for room and board for the eight days a month she stayed in Lubis and Siregar's basement. Payment was made once a month, at the end of the month, when Siregar gave Umar a list of what each woman owed. Umar then collected the money from the victims and gave it to Siregar.

Besides the "rent," Lubis and Siregar imposed additional charges. Thus, for example, when the victims wanted to send money home to their families in Indonesia, Lubis and Siregar required that Lubis send the money. According to Eva, Lubis charged the women ten percent of the amount sent to Indonesia, sometimes a little more. So, for example, if a woman wanted to send $1,000, Lubis would charge $100. One time, when Eva sent $5,000 to her family, Lubis collected a $600 fee.

Lubis told Eva that he sent the victim's remittance to his brother, Mumi Lubis, who lived in Indonesia, and Mumi would deliver the money to the respective families. On one occasion, some of the women sent money home via "moneygram," which is cheaper. According to Eva, she could send a $1,000 "moneygram" to Indonesia for only $20. Lubis found out about the moneygram, got angry, and forbade the victims from ever doing that again.

Another expense involved Lubis's two children, Irna and Andi Lubis. Every month each woman generally would give Lubis's children $10 to $20 for "spending money." Siti Siregar told the women that they should give the money to her children. Failure to do so resulted in remarks from Siregar that the women were "stingy," and the offending woman would be ostracized. Eva quickly learned that it was easier to give the money even though Lubis's children were much better off than Eva's two children in Indonesia.

In February or March of every year Lubis would demand "tax" money from the women, claiming that it was for the payment of taxes. According to Eva, each victim was required to pay $100 to $250 depending on how much a particular victim had earned the previous year.

Lubis also charged Eva $25 each time he transported her to Dr. Cohen's house (which was 1/4 of the money she earned from Dr. Cohen) and $5 for each trip to the mall, even though the trips to the mall took only five minutes. Additionally, Lubis sold the women phone cards for long-distance calls.

**Living Conditions.** Eva stated that on the weekends most of the women slept in Lubis's basement. Lubis's house is a one-family dwelling. Besides Lubis and Siregar, their two children and Lubis's sister-in-law (Ratna Siregar), Eva stated that sometimes as many as eleven Indonesian

women lived in the house.  Many of the women slept two to a bed.  Not surprisingly, Eva stated that the basement was crowded.

**Sexual Assaults.**  Eva stated that Lubis sexually assaulted her at least 50 times, probably more.  The sexual assaults started within a year of her coming to live with Lubis.  According to Eva, Lubis would touch her breasts and vaginal area and would digitally penetrate her.  Afterwards, Eva would frequently vomit.

Eva said that other victims told her that Lubis had kissed them or tried "something" with them.  For example, another victim, Heti Binti Pahru ("Endang"), told Eva that Lubis had tried to touch Endang's breasts.  Hanik Muflikhatin M. Noor told Eva that Lubis had tried to touch her while they were at the home of the family for whom Hanik worked.  Nuryati Lili, yet another victim, told Eva that Lubis had tried to kiss her but that she resisted and Lubis became very angry.  Based on statements like this and the abuse she suffered, Eva believes that Lubis has sexually assaulted other women.

**Threats and Climate of Fear.**  One of the other victims who resided at Lubis's house when Eva was there was named "Tini."  Tini and Eva are from the same village in Indonesia, and Lubis knew this.  When Tini escaped around 2006, Lubis told Eva that she had better not leave and that if she did he would kill her by running her over with his car.  Lubis said that he was getting old and had health problems so he did not fear being arrested.

Lubis also once mentioned to the victims that he could easily hire someone to kill their families in Indonesia, and that he knew where their families lived.  Lubis told Eva that he had friends in Indonesia who are gangsters and assassins.  Lubis also threatened to have disobedient women

sent back to Indonesia.  On other occasions, he told the women that if they ran away he would find

them.  Eva understood this to be a threat to use violence.

When he was angry, Lubis also had a tendency to drive recklessly and erratically, and Eva

and other women feared that he would kill them with his erratic driving.  When this happened, the

victims in the car would frequently start screaming and crying.

OUTBURSTS.  Eva related, however, that Lubis never hit her nor did she ever see him hit

anyone else.  He frequently threw tantrums, however, and would strike objects and throw objects.

Indeed, he broke numerous cell phones in his angry outbursts.  This scared Eva and she opined that

all of the women were afraid of Lubis.  Lubis also would refuse to speak to her when he was angry,

sometimes for over a month.

Eva feared Lubis and said she did not believe she was free to leave Lubis.  Eva said she first

wanted to leave Lubis and Siregar within the first year she worked for them.  But for her fear of

Lubis, Eva said she would have run away.  Indeed, she said she was so afraid of Lubis that she often

suffered insomnia.  Eva said she hated weekends because that meant going back to Lubis and

Siregar's house.

According to Eva, the victims generally did not talk about escaping because they did not

know who they could trust and they feared that one of the other victims would tell Lubis.  Srimunah

Mustakim Umar, in particular, was close to Lubis and had been with him the longest.  Eva related

that Umar used to spy on the victims for Lubis and Siregar.

HARASSING CALLS TO EVA'S FAMILY.  When Eva finally escaped, Lubis called her

husband, sister, and daughter in Indonesia and told them that Eva had run away with another man.

Eva opined that Lubis did this to embarrass her, bring shame upon her, and cause her family to

disown her and inflict revenge on her.  Also after Eva had escaped, around August 2007, Lubis visited Eva's husband in Indonesia and again disparaged Eva.  According to Eva, Lubis's family does not live near Eva's family and Lubis had no reason to go to her village other than to harm her reputation and her standing with her family.

**Eva's Passport.**  Because the Bahrainian diplomat still had Eva's passport when she left him, the diplomat sent it to the Indonesian placement company that had placed Eva with him.  The placement company then sent the passport to a friend of Eva, who in turn gave it to Eva's husband.  On Lubis's instructions, Eva's husband gave her passport to Lubis's brother in Indonesia (Mumi Lubis), who in turn sent the passport to Lubis.  Lubis and Siregar retained control of Eva's passport and to this day they have never returned it to Eva.[9]  According to Eva, Lubis kept the passports of all of the women.  Eva usually did not ask Lubis for her passport because she was afraid of him.  Once, when she did ask, he claimed that her passport was in Jakarta.  Eva said that one reason she did not leave Lubis was the fact that he had her passport.  Eva feared United States police because the police in Indonesia are corrupt.  She also thought she would be arrested for not having her passport.

---

[9]  Thus, both Siregar and Lubis committed Document Servitude, in violation of 18 U.S.C. § 1592(a), insofar as they knowingly concealed, confiscated, and possessed Eva's passport in the course of committing forced labor.  See United States v. Farrell, 563 F.3d 364, 376 (8th Cir. 2009) (listing the elements of Document Servitude).

In "Defendant's Position on Sentencing Factors," Lubis argues that he did not keep the victims' passports against their will.  His wife, Siti Siregar, however, admitted in her Statement of Facts that she lied to federal agents when she told this same story.  Siregar Stmt. of Facts ¶¶ 12a; 14.  Siregar also admitted: "the defendant [Siregar] and her husband [Lubis] imposed a number of rules on the Indonesian women who resided in their basement, including . . . a rule that the women give their Indonesian passports to the defendant and her husband."  Siregar Stmnt. of Facts ¶ 5.

**Exploiting Islamic and Indonesian Culture.**  Eva also related that Indonesia, like other Asian nations, has a culture of gratitude where people profusely express gratitude for small favors done for them.  Lubis exploited this culture by constantly berating the women for being ungrateful for all that he had done for them.

Eva also related that she is from Java, and that in Java people are generally passive.  So, for example, in this culture a worker never questions a decision made by an employer.  They simply defer to the employer.  Lubis, Eva, and the other women are Moslems and, according to Eva, in Islamic culture women do not question the decisions of men.

**Rules and Restrictions on Freedom.**  Lubis and Siregar required that the women obeys their rules.  One of these rules is that a woman cannot leave the house unaccompanied (except for short visits to a corner store down the street from Lubis's home).[10]  The women also were not allowed to have cellular telephones.  They could not send money home to their families except through Lubis (who charged a fee of 10 percent of the amount sent).

Lubis prohibited the victims from conversing (other than exchanging pleasantries) with anyone other than the families for whom they worked.  Before they went out, Lubis would lecture them not to talk to others and not to give out the home phone number.  Lubis also told Eva that she

---

[10]  In her Statement of Facts, Siregar admitted that she and Lubis imposed various rules on the women:

> The defendant [Siregar] and her husband [Lubis] imposed a number of rules on the Indonesian women who resided in their basement, including a rule that the women not leave the defendant's house unaccompanied by another woman or a member of the defendant's family and a rule that the women give their Indonesian passports to the defendant and her husband.

Siregar Stmnt. of Facts ¶ 5.

was not allowed to leave the Washington, D.C. area since she was "illegal." Another rule was that the victims must return to Lubis and Siregar's house every weekend.

**Yani Maryani.** Another of the Indonesian women who worked for Lubis was a woman Eva knew as "Yani Maryani."[11] According to Eva, Yani used to cry a lot, more than the other women. Yani told Eva that Yani's mother had written to the United States Embassy in Indonesia and that the police were looking for Yani but had not found her.[12] Lubis also told the women that the police were looking for Yani. Lubis had Yani sent back to Indonesia.

**Escape From Lubis.** Eva stated that in July 2007, she escaped from Lubis. She did this simply by staying on with the Ottensteins and by sending a letter to Lubis telling him that she had decided to move to Boston. Eva was so fearful of Lubis that she actually traveled part of the way to Boston before returning to the Ottenstein's house. Eva also called him and told him that she was moving away because she needed a more restful life. She created this ruse because she feared that if Lubis knew she was still in Maryland, he would be angry and would try to harm her or forcibly take her back. Eva said that she called Lubis two or three times after she left him so as to keep up a good front and good relations with him because she was afraid of him and did not want him hunting for her.

**Eva's Subsequent Encounter with Lubis.** Three of the victims worked at homes in Potomac, Maryland, near the Ottenstein residence where Eva lives. Around July 2008, while Lubis was driving one of these women to work, he saw Eva standing at a bus stop. Lubis told Eva to get

---

[11]    According to the U.S. Department of State, Yani's name is Yani Bt Mahali Abdullah.

[12]    In fact, Yani's mother had indeed written a letter to the U.S. Embassy in Jakarta, Indonesia. In the letter she stated that Yani was being held by Soripada Lubis.

in his vehicle.  Lubis instructed Eva to come to his house the following Sunday.  Lubis also warned Eva, "If you don't come, you know me."  Eva understood this to be a threat of violence, but she never went to Lubis's house.

Eva remains fearful of Lubis and is undergoing counseling to deal with the sexual abuse she suffered.

### C.       Nuryati Lili ("Nur")

Nur is an Indonesian woman whom Lubis and Siregar held in their basement on the weekends from January 2002 to October 26, 2008, when FBI and ICE rescued her and other victims.

**Recruitment.**  Nur first came to the United States in August 2001 on a worker's visa.  She came to the United States to do domestic work for a Saudi family in Vienna, Virginia.  Nur worked for this family for around two years.  The Saudi family paid her only $150 per month and the Saudis did not give her any days off; she worked 12 to 14 hours per day.  This same family employed another domestic servant whom Nur knew as "Yani Maryani."

One day, Lubis knocked on the door and introduced himself.  He asked Yani and Nur if they wanted to live at his house and work for American families.  Lubis said that the women would have the weekends off and could live with him on the weekends.

In December 2001, Nur decided to work for Lubis, although she and Yani did not move to Lubis and Siregar's basement until January 2002.

**Work.**  Nur has had a number of different employers since coming to Lubis's house in 2002.

From January 2002 to September 2002, Lubis and Siregar were unable to find work for Nur, so she worked for Siregar and Lubis.  She was never paid for this work.

From September 2002 to August 2004, Nur worked for the Tangung family in McLean or Sterling, Virginia. Srimunah Mustakim Umar found this job listed in the newspaper and Lubis took Nur to an interview in August 2002, which was attended by Lubis, Siregar, and Umar. The Tangungs paid Nur between $350 and $400 per week and Nur liked working for them. Lubis, however, ordered Nur to quit this job because it was not convenient for him to drive to and from the Tangungs' house. Nur obeyed.

After leaving the Tangungs' employment, Lubis and Umar took Nur to Valerie Lederberg for an interview. Valerie Lederberg was a friend of Melissa Banner, Umar's employer. Lederberg paid Nur only $325 per week, however. Nur worked for Jill from September 2004 to June 2005. She left because Lederberg asked her to come to her beach house to work for the summer. Nur was happy to go, but when she told Siregar, Siregar instructed Nur to quit the job. Nur felt she had no choice but to comply with Siregar's instructions.

Once she was forced to quit her job with Valerie Lederberg, Lubis and Umar took Nur to an interview with Jill Schwartz, another friend of Melissa Banner. Nur worked for Ms. Schwartz from September 2005 to July 2007. In the summer of 2007, however, Ms. Schwartz was going to spend the summer at her lake house, and Nur knew that Lubis would not permit her to go so she again had to quit her job.

Siregar and Umar then arranged for Nur to work for the Martin family. The Martins hired Nur and she worked for them from around August 2007 to October 2008. The Martins paid Nur $380 per week. She worked Monday through Friday. Nur stayed at the Martins' house Monday through Thursday night, and resided at Lubis and Siregar's house the other three nights.

18

**Uncompensated Labor for Siregar and Lubis.**  As mentioned above, Nur came to Lubis's house in January 2002, but did not immediately obtain a position with an American family.  Instead, from January 2002 to September 2002, she helped Siregar clean houses three days per week for about 4-5 hours per day.  Siregar never paid Nur for this work.  When not working with Siregar, usually at night, Nur worked with Lubis delivering parcels, usually luggage that airlines had lost.  Lubis did not pay Nur for this work either.

Also, on Saturdays, Siregar generally would take four of the victims, including Nur, to a home in Washington, D.C., which they would clean.[13]  Siregar did not pay the victims for this work.  Prior to Turiah assisting Lubis with his newspaper deliveries (discussed below), Nur would assist him.  Lubis also never paid Nur for this work.

**Finances and Incidental Expenses.**  Because Nur did not immediately have a job when she came to live with Lubis, Siregar charged Nur only $100 per month to live at the house, and Siregar did not require Nur to pay this money until she found a job.  Siregar and Lubis steadily increased the "rent," however, and by October 2008, Nur was paying Lubis $375 per month for "rent and transportation."  Siregar would make a list of the women and their charges and Umar would collect the money from the women and take it to Siregar.

Lubis also charged Nur a 10 percent fee to send money to Indonesia, so that if she sent $1,000 to Indonesia, she would need to pay Lubis $100.  Lubis also told the victims that he needed to pay taxes on this money he sent, so additional "taxes" had to be paid to Lubis.  Some of the victims

---

[13]  Based on facts related by the victims and the admissions of Alan K. Palmer that Siregar would bring Indonesian women to his D.C. home to clean it, it is apparent that the home Nur was cleaning belongs to Alan K. Palmer and his wife.

secretly began wiring money to their families. Since then, Lubis dropped his fee to 5 percent of the wired amount.

**Living Conditions.**  When Nur and Yani moved into Lubis and Siregar's basement, there were already eight other women living there, for a total of ten: Eva, Tini, Lilis, Sari, Tole, Yaini, Umar, and Rani.  Mrs. Martin told Nur she was welcome to stay with the Martins even on the weekends, but Nur knew that Lubis would never allow this, as he would then have no reason to collect "rent" from Nur.

**Lubis and Siregar's Rules and Restrictions on Freedom.**  Nur related that Lubis and Siregar had a number of rules that all of the women were required to follow:

1.  the victims had to return to Lubis on the weekends;

2.  the victims were not allowed to travel anywhere with their client families;

3.  the victims were not allowed to go anywhere unless escorted by Lubis or Siregar;[14]

4.  other than their employers, the victims were not allowed to speak to anyone who did not reside in Lubis's house;

5.  if the women wanted to send money to Indonesia, they had to do so through Lubis; and

6.  the women were not allowed to give out Lubis's address or telephone number.

**Lubis's Confiscation of Nur and Eva's Passports.**  When Nur and Yani moved into Lubis's house, their Saudi employer still had their passports, so Lubis took them to the Indonesian Embassy to request that the Embassy try to get their passports back.  The Saudi family, however, refused to return them, so they applied for new passports, unsuccessfully.  In December 2006, Nur

---

[14]  Nur said that prior to Tini running away, the women were sometimes permitted to go to the local store without Siti or Lubis, but this changed once Tini escaped.

obtained a new passport from the Indonesian Embassy. On the drive home from the Embassy, Lubis instructed Nur to give him the passport, ostensibly so that he could make a copy. Nur complied and never saw the passport again.[15] Eva also got a new passport then, and Nur said that Lubis also took Eva's passport.

**Threats and Climate of Fear.**

THREATS TO KILL TINI'S FAMILY. Around the summer of 2005, after Tini had escaped, Nur heard Lubis talking on the telephone telling the person on the line to kill Tini's family in retaliation for her leaving.[16] Nur said she was not fearful for her family so long as she stayed with Lubis and this is one of the reasons that Nur continued to stay with Lubis.

THREATS TO SEND VICTIMS BACK TO INDONESIA. Lubis would occasionally threaten to send the women back to Indonesia if they made mistakes or angered Lubis. In particular, Nur recalls that after Eva ran away Lubis warned all of the victims that if they ran away he would look for them, find them, and have them deported to Indonesia.

THREATENED ABUSE OF THE LEGAL PROCESS. Lubis also told the women that if they stayed with Lubis, they would be safe, but if they went out on their own, "immigration" would

---

[15]   This, again, is another instance of "document servitude," insofar as Nur's passport was knowingly confiscated in the course of committing force labor. See Farrell, 563 F.3d at 376.

[16]   By allowing other victims to overhear his threats, Lubis helped create a climate of fear that would ensure the victims would obey and would not attempt to escape. United States v. King, 840 F.2d 1276, 1281 (6th Cir. 1988) (threats and other coercion created "pervasive climate of fear"); United States v. Warren, 772 F.2d 827, 833-34 (11th Cir. 1985) (finding "grotesque" the "use, or threatened use, of physical force to create a climate of fear").

give them problems.  Lubis said that if immigration arrested them they would be shackled, put in prison, and then sent to Indonesia.  Needless to say, this frightened Nur.[17]

    FITS OF ANGER.  Nur stated that when Lubis was angry he would either ignore the object of his anger or throw and break objects, like plates and glasses.

    **Sexual Advances.**  Lubis would frequently attempt to touch Nur, especially when he drove her to work on Monday mornings.  Every time that Nur rejected his advances, Lubis would get angry.  Nur said that Lubis would inappropriately touch her neck and shoulders.  She said that Lubis never touched her "private parts," although he tried to touch her breasts.  Lubis frequently asked Nur to kiss him, but she would just push him away.  Once, Lubis threatened to tell Nur's family about her "bad behavior" if she didn't do what he wanted.

    One night when Nur was working for the Tangung family, Lubis came to their house in the middle of the night.  He grabbed Nur and kissed her, but Nur was able to push him out the door and close it.  Nur related that when Eva lived there, Eva would complain to her about Lubis's sexual overtures.  Hanik also would cry and tell Nur that Lubis had tried to touch her inappropriately.

    **Yani Maryani.**  Nur stated that she heard that the police had been looking for Yani at her employer's house and that Lubis decided to send her home.  Lubis told victims that he feared that if the police came to his house looking for Yani, they would check the immigration documents of all the women and they would find out that they were in the United States unlawfully, and all of them would be deported.

---

[17]   This is yet another instance of Lubis abusing law and the legal process or threatening to do the same.  Farrell, 563 F.3d at 373.

**Desire to Leave.**  As noted above, Mrs. Martin invited Nur to live permanently with the Martin family.  Nur wanted to move in with the Martins, but she said she knew that Lubis would not allow it and she did not even ask him because she feared him.  In particular, Nur feared that Lubis would have her deported to Indonesia.

### D.    Turiah Tarjuki

Turiah Tarjuki ("Turiah") is also an Indonesian woman who resided in Lubis and Siregar's basement, generally on the weekends, from around spring 2002 to October 26, 2008.

**Recruitment.**  Turiah said that she first came to the United States in December 2001 on a work visa with a Yemeni family connected with the Yemeni embassy.  Turiah worked for the Yemeni family for twenty-one months, in McLean, Virginia.  The Yemenis paid her $300 per week.

Turiah stated that in Spring 2002, while she was at the Tyson's Corner mall with her employer, Numarah (who has since gone back to Indonesia)[18] approached Turiah and gave her Lubis's telephone number and said that Lubis could find her a better job.  Lubis was also present, but he did not speak to Turiah.  When she spoke with Lubis on the telephone he also promised her a better job.  Turiah decided to leave her employer and left with a co-worker, Rani, who has since gone back to Indonesia.

**Work.**  Siregar arranged for Turiah to be interviewed by the Weiss family and Siregar was also present during the interview.  Turiah did not know the Weiss family; rather, they were friends of Melissa Banner, Umar's employer.  At the interview, Siregar told the Weiss family that they must pay Turiah cash.

---

[18]    Turiah heard that Lubis sent Numarah home because she had met a married man.

Turiah worked for the Weisses Tuesday through Saturday, cleaning and babysitting. When she first started with the Weisses, they paid her $270 per week. The Weisses increased this to $300, then $320, and in October 2008 they were paying her $350 per week.

**Uncompensated Labor for Siregar and Lubis.** Turiah assisted Lubis on his paper route nearly every Sunday. She would usually get up at 3:00 A.M. and work until 7:00 or 8:00 A.M. Lubis never paid her for this. According to Turiah, Lubis delivers around 300 papers. On Mondays, Turiah also assisted Siregar in cleaning houses in D.C., for which Siregar never paid her.

**Finances and Incidental Expenses.** Turiah stated that when she first began living with Siregar and Lubis, she paid $280 per month for rent and transportation. The price gradually increased, and by October 2008, Turiah was paying $375 per month for "rent," "transportation" to and from her employer's residence, and food. As far as Turiah knows, all of the women paid the same amount. Umar collected the money from the women and then gave it to Siregar.

**Living Conditions.** On the weekends, when Turiah resides at Lubis's house, there are four beds in the basement, so the women have to share beds. Turiah, for example, sleeps in a bed with two other women. Because there is limited room at the dining room table, the women generally sit on the floor and eat around a coffee table.[19]

---

[19] The overcrowded conditions that women endured at Lubis's residence are particularly important in this case. As the Supreme Court has noted, poor conditions are relevant to determining whether involuntary servitude has occurred. United States v. Kozminski, 487 U.S. 931, 952, 108 S. Ct. 2751, 2765, 101 L. Ed. 2d 788 (1988). Furthermore, when one contrasts the overcrowded conditions at the Lubis residence (where the women had no privacy and shared beds) with the relatively luxurious living conditions they enjoyed at the homes of the client families, Lubis's claims that the women voluntary returned to his overcrowded house on the weekends (and voluntarily paid through the nose for these substandard living conditions) are obviously preposterous.

In contrast, at the Weisses' house, Turiah had her own room with her own television, telephone, and bathroom. She also did not have to compensate the Weiss family for the food she consumed and they treated her well.

**Lubis and Siregar's Rules and Restrictions on Freedom.** Turiah noted some of the rules that Lubis and Siregar imposed on the victims:

1. although Turiah is single, she was not permitted to go on dates or meet men;

2. anywhere they went, the victims had to travel in groups, not by themselves; no victim was allowed to go outside by herself;[20]

3. the women were required to return to Lubis's house on the weekends;[21]

4. Turiah was not allowed to call her boyfriend in Indonesia;

5. the women were not allowed to socialize with anyone not known to Lubis and Siregar; and

6. the women had to send money to Indonesia through Lubis and could not send money on their own.[22]

Turiah noted that Lubis's children were not bound by these same rules.

---

[20]    Turiah said she thought Lubis had this rule to ensure that the women did not meet someone else who might help them leave Lubis.

[21]    Turiah stated that she returned to Lubis's house on the weekends because of this rule and because she wanted to see her friends. She also stated that Lubis frequently reminded them of this rule. Turiah said she would have preferred to have stayed at the Weisses' house on the weekends, but thought this would make Lubis angry.

[22]    Turiah related that one time she found a way to send money on her own but that she knew this would make Lubis angry. She noted that it was much cheaper to send money by herself and she understood that this rule was another way for Lubis to make money.

**Passport Confiscation.**  In 2002, Lubis took Turiah to the Indonesian Embassy to obtain her passport, which the Yemeni family apparently returned to the Embassy.  When she obtained the passport, Lubis said he needed to make a photocopy of it but never returned it.[23]  Again in spring 2006, when her other passport had expired,  Lubis took Turiah to obtain a new passport and he again took it and never returned it.[24]

**Threats and Climate of Fear.**

ERRATIC DRIVING.  Turiah, like the other victims, confirmed that Lubis would sometimes drive recklessly when he was angry.  Various things would cause Lubis to get angry, such as when a victim was not ready and waiting to be picked up from an employer's house.

WARNINGS ABOUT IMMIGRATION.  According to Turiah, Lubis told all of the victims that if "immigration" saw the women, they could be arrested and sent back to Indonesia.  Turiah was afraid she could be put in jail because she knew she was not lawfully in the United States.

THREATENED ABUSE OF THE LEGAL PROCESS.  Lubis also told victims that if they ran away, they would be caught by the police and he reminded them that they had no documents

---

[23]  Recall that this was the same excuse Lubis used to confiscate Nur's passport, as discussed above.  This, again, is another instance of "document servitude."  See Farrell, 563 F.3d at 376.

[24]  Pursuant to a search warrant executed in October 2008, the FBI discovered eight Indonesian passports in Lubis and Siregar's house after Siregar showed the agents where she had secreted them.  Initially, however, Siregar denied having the victims' passports.  This false exculpatory statement is further proof of Siregar and Lubis's commission of document servitude. United States v. Angwon, 271 F.3d 786, 797 n.2 (9th Cir. 2001) ("Guilty intent can be inferred from the defendant's conduct and other circumstantial evidence, such as the defendant . . . lying or giving inconsistent statements to government agents . . . .").

(because Lubis and Siregar had confiscated their passports).  Lubis told Turiah and the others that they would be put in jail and then sent home if the police caught them without their passports.[25]

<u>THROWING OBJECTS.</u>  Turiah stated that when Lubis gets angry he has a tendency to yell and also may throw and break objects, such as plates or glasses.  This makes Turiah "uncomfortable."  Turiah said that Lubis "often" gets angry.  Turiah said that Lubis gets angry when one of the women breaks the rules or annoys Lubis.  For example, once Lubis asked Turiah to take out the trash and she failed to do it, which made Lubis angry.

<u>DEPORTATION TO INDONESIA.</u>  Turiah understood that if she caused Lubis any grief she would be sent back to Indonesia.  Indeed, Lubis told her that on more than one occasion.  Turiah stated that her family is financially dependent on Turiah.  For example, the money Turiah sends home helps to buy food for her family, permits her father to see a physician, and allowed her sister-in-law to give birth in a hospital.

Turiah said that Siregar once caught a victim named "Mujiyati" packing clothes and Siregar asked her if she was running away.  Mujiyati denied it, but that night Turiah heard Lubis call a travel agency and order a ticket.  The next day, Lubis and Siregar took Mujiyati to the airport.  Turiah went to the airport to see Mujiyati off and she said Mujiyati was crying.  Mujiyati lived with Lubis around three years.

---

[25]  Lubis, on page 6 of "Defendant's Position on Sentencing Factors," argues that "no such threats were ever made and it would be against his own interests to make such threats." Lubis's threats advanced his and Siregar's interests insofar as they catalyzed such fear in the victims that they were too scared to leave, resulting in Lubis and Siregar continuing to mulct the victims of their hard-earned money.

Around 2004, Lubis also told Turiah that he had previously sent a women named "Munawaroh" back to Indonesia because Munawaroh disobeyed him and had a boyfriend. Lubis said: "If you don't do as I say, I'll send you home like Munawaroh."[26]

After another victim—Tini—ran away, Lubis told all of the women that they were free to leave, but that they needed to let him know in advance. Presumably this was to ensure that he could send them home. Turiah said she did not believe Lubis, as he had frequently told the women not to run away and threatened to send them home if they attempted flight. Indeed, Turiah said that even after Tini left, Lubis threatened to send the women home if they ran away. After Eva left, he again threatened to send home any woman who ran away.

DISCIPLINARY MEETINGS. Turiah also related that whenever one of the victims caused "trouble," Lubis would hold a meeting to discuss the infraction. For example, if a victim was running late and caused Lubis to have to wait at an employer's house, Lubis would get angry and would hold a meeting to discuss this. At these meetings, Lubis would also remind the women not to cause trouble because they did not have the requisite "paperwork" and there might be incidents where they are caught by the police.

CALLS TO INDONESIAN BOYFRIEND. Turiah also noted that Lubis became angry with her around 2006 when she called her boyfriend in Indonesia. Lubis told her that she could not make such calls and that her focus needed to be on her work and not on her boyfriend. Lubis told Turiah he would sent her back to Indonesia if she called her boyfriend again.

**Yani Maryani.** Turiah mentioned that a woman named "Yani" previously lived in Lubis and Siregar's basement, but that she was sent home because the police had been to Yani's employer's

---

[26]  The United States believes that this is Munawaroh Bt Abdul Kham.

28

house.  Turiah said Siregar had Yani sent home even though Yani did not want to leave the United States because Siregar feared that Yani would cause trouble for them and the other women.  Umar told the women that Yani was sent back because of the difficulties that her mother had caused.

Lubis also gathered the victims together, along with Siregar, and told them that Yani was going to be sent home because her mother had called the police and it was better to send Yani home than to risk everyone getting caught.  Lubis continued that if Yani were caught, all of the other women would be caught as well, since none of them had the correct "paperwork."

**Sexual Assaults.**  In her initial interview, Turiah stated that she is not aware of Lubis touching anyone inappropriately.  She subsequently admitted, however, that Lubis has repeatedly had sexual contact with her, including the day the FBI and ICE searched Lubis and Siregar's house.

Turiah said that Lubis started touching intimate parts of her body about two years ago.  He did this first in the car, but also in the house if they were alone together.  Initially she refused him but he kept insisting so she finally gave in because there was nobody around to help her and she feared Lubis.  Turiah said that Lubis has performed sexual intercourse on her more than ten times.  Turiah said she felt both angry and sad about what happened.

**Desire to Leave.**  Turiah stated that she wanted to leave Lubis's at least by spring 2004.  She stayed, however, because her friends were still at Lubis's house and she did not think Lubis would let her leave.  But for Lubis and her fears of him, Turiah stated that she would have stayed at the Weisses' house on the weekends and would not have returned to Lubis and Siregar's basement.

    **E.**    **Supartini Katmo ("Tini")**

Tini is an Indonesian woman who worked for Lubis and Siregar from October 2004 to June 2006, when she escaped. Tini was using the money she earned in the United States to support her husband, three children, and six siblings.

**Uncompensated Labor for Siregar.** On Mondays, from around 10:00 A.M. to 3:00 P.M., Tini would assist Siregar in cleaning houses in Arlington, Virginia, for which Siregar paid Tini nothing.

**Finances and Incidental Expenses.** Umar collected "rent" from the women, which Tini stated was $320 per month. In addition, Umar instructed Tini to give Irna Lubis and Andi Lubis $10 per month. Lubis required Tini to send money to Indonesia only through him and he charged between 10 percent and 15 percent of the amount Tini remitted to Indonesia.

Tini noted that after she escaped from Lubis and Siregar, because she with her employer on the weekends, she no longer had to pay "rent," "transportation fees," Lubis's remittance fees, or "tips" for Andi and Irna Lubis. Thus, Tini was able to send more money to her family.

**Lubis and Siregar's Rules and Restrictions on Freedom.** Tini recounted various rules and restrictions that Lubis and Siregar imposed on the victims:

1. the women could not have visitors to the house (except for friends of Lubis and Siregar if Lubis or Siregar invited them);

2. the women were not allowed to make friends with people who did not live in the house;

3. the women were not allowed to own cellular telephones;

4. money sent back to family members in Indonesia had to be sent through Lubis;[27]

---

[27]   Lubis told Tini that she could not send the money herself because she lacked the appropriate papers. Tini knew, however, that Lubis and Siregar's chosen supervisor, Umar, was

30

5. the women were not allowed to go outside the house unless accompanied by Lubis, Siregar, or someone chosen by Lubis and Siregar;

6. Lubis prohibited the women from talking to the neighbors;

7. Umar instructed Tini to give Andi Lubis and Irna Lubis $10 per month; and

8. the women had to return to Lubis and Siregar's house on the weekends.

**Threats and Climate of Fear.**

THREATS TO FIND HER.  Lubis explicitly told Tini that she was not free to leave and that if she tried to run away he would find her.  According to Tini, Nur was also present and this threat was precipitated by Lubis ordering Nur to stop working for her employer since the employer lived a distance from Lubis's house.

FITS OF ANGER AND THROWING OBJECTS.  Tini did not like to see Lubis angry, as this frightened her.  When he was angry, Lubis would often throw objects.

RECKLESS DRIVING.  Tini noted that another thing Lubis did to scare the women was to drive erratically.

THREATS TO HARM THEIR CHILDREN.  Lubis also told Tini and other victims that if one of the victims ran away from him, he would run over that woman's children with his car.  Tini recalled that Siregar, Eva, Umar, and Nur were present when Lubis made this threat.  Siregar did not say anything.  That night, this was the topic of conversation among all ten women who were then living in the basement.

**Tini's Escape.**  Tini stated that she waited until Lubis and Siregar were on vacation to escape since she knew that they would not let her leave.  Indeed, Lubis explicitly told Tini that she was not

---

unlawfully in the United States and yet was able to send money back to Indonesia.

free to leave his house and live elsewhere. Although Tini feared what Lubis would do to her if she escaped, she was more fearful that he would harm her if she stayed. So she arranged for her employer to pick her up from Lubis's house when Lubis and Siregar were in New York and only their daughter, Irna Lubis, and some other victims were at the house.[28] After Tini had escaped from Lubis and Siregar, a relative of Lubis who identified himself as "Mumi Lubis" traveled to Tini's home in Indonesia and informed Tini's husband that Tini had left Lubis. This made Tini's husband fearful. Lubis also told Tini's husband that Tini owed him money and that if she did not pay it back, Lubis would hire someone to harm Tini's family.

### F.     Heti Binti Pahru ("Endang")

Endang is an Indonesian woman who was harbored by Lubis and Siregar from around the summer of 2005 to October 26, 2008.

**Recruitment.** Endang came to the United States in 2001 to work as a housekeeper and nanny for a Saudi diplomat. Although her contract stated she would receive $1,200 per month, the Saudis paid her just $200 per month. She liked the Saudi family except for their failure to pay her what they had promised. She needed the money to repay a family member who had loaned Endang around $2,000 to finance her trip to the United States. A man gave Endang Lubis's number. She called Lubis and he picked her up from the Saudis' house.[29]

---

[28]   One reason Tini was able to leave was that she—unlike the other victims—still had her passport because she had not told Lubis she had her passport.

[29]   Lubis, on page 4 of "Defendant's Position on Sentencing Factors," makes much of the fact that the victims initially agreed to reside at Lubis's on the weekends. People in the United States are free to change their minds, however, and once the victims learned what life under the thumb of Lubis and Siregar was like, they wanted to leave.

**Work.**  Endang held a number of positions while she worked for Lubis and Siregar.

After she arrived in Lubis's house, Lubis took her for an interview with an Iranian family. The Iranians hired her and paid her $1,300 per month.  Lubis came around the Iranians' house, however, which they found objectionable.  Endang told Lubis and he required Endang to quit that job.  Endang worked for the Iranian family from February 2005 to summer 2005.

After working for the Iranian family, Endang did not work for two months.  Siti Siregar then took her to an interview with a "Madame Nabila," who hired Endang and initially paid her $300 per week, which was later increased to $375 per week.  Lubis also told Endang to quit this job. Apparently Endang worked for Madame Nabila from fall 2005 to January 2007.

Lubis and Siregar took Endang to an interview with the Olan family in January 2007. Endang began working for the Olans in February 2007, and the Olans paid Endang $375 per month for cleaning and taking care of their children.

**Uncompensated Labor for Siregar.**  During the two-month interval in the summer of 2005 when Endang was out of work, she helped Siregar clean houses six days per week for about six hours per day.  Siregar never paid Endang for her efforts.

_____

The fact that a victim initially may have agreed to work for the defendants, or for a client family approved by the defendants, does not mean that the United States is incapable of proving that her labor was compelled.  If a person willingly begins working for Lubis, but later wants to withdraw and is then forced to remain and perform work against her will by the use or threat of force or legal coercion, then her service becomes involuntary.  Pattern Crim. Jury Instr. 11th Cir., Offense Instruction No. 59 (2003); United States v. Shackney, 333 F.2d 475, 484 n. 13 (2d Cir. 1964); United States v. Mussry, 726 F.2d 1448, 1454 n. 6 (9th Cir. 1984) ("Even though a person may come to a job voluntarily, subsequent coerced service constitutes involuntary servitude."), overruled on other grounds, United States v. Kozminski, 487 U.S. 931 (1988); United States v. King, 840 F.2d 1276, 1283 (6th Cir. 1988) (one cannot consent to being held in servitude).

**Finances and Incidental Expenses.**  Endang said she paid Siti and Lubis $375 per month for "rent" and "transportation."  Prior to that, in August 2008, she had paid only $350 per month. As with the other women, Lubis charged Endang to send money to Indonesia.

**Lubis and Siregar's Rules and Restrictions on Freedom.**  Like the other victims, Endang noted a number of rules that Lubis and Siregar imposed:

1.  the women were not allowed to go out of the house unless accompanied by Lubis or Siregar (except that they could sometimes go to a local store if they went with one of the other women);

2.  the victims had to return to Lubis's house on the weekend unless their employer requested that they stay a particular weekend to assist them and only if the women cleared it with Lubis in advance;

3.  the women were not allowed to socialize or make friends with people who did not live in Lubis's house; and

4.  the women were not allowed to have visitors to the house.

**Passport Confiscation.**  Lubis asked Endang for her passport the first day she came to his house.  Lubis told Endang that it would be easier to get her passport extended if he were holding it. Endang said she did not want to give him her passport, but she gave it to him so that she would not get into trouble.  Lubis never returned Endang's passport to her.

**Threats and Climate of Fear.**

ERRATIC DRIVING.  Like the other women, Endang also noted that when Lubis was angry he would sometimes drive erratically so as to terrify the victims.

FITS OF ANGER.  Endang reported that when he is angered, Lubis has a tendency to yell and throw objects, including breakable objects.  For example, he throws plates and glasses.  Various things make him angry, such as the women asking to be driven to the mall or being late when Lubis comes to the employer's house to pick them up.

THREATS TO SEND THEM BACK TO INDONESIA.  Endang also stated that on many occasions Lubis had threatened to send women back to Indonesia.[30]  She believed him, too, because she knows that Lubis sent a woman whom Endang calls "Minah" back to Indonesia in 2007.[31]  It was Endang's birthday and they were looking for Endang's shoes in the basement.  Siregar found Minah's blanket with clothes folded up as though she were leaving.  So Lubis and Siregar sent Minah back to Indonesia.

According to Endang, Lubis also told the victims that those who failed to follow his rules would be sent home.  He also said that if anyone ran away, he would find that person, catch her, and send her back to Indonesia.

---

[30]    Lubis, on page 6 of "Defendant's Position on Sentencing Factors," argues that any threats of deportation would actually harm Mr. Lubis by depriving him of income and exposing him to arrest and conviction for violating immigration laws.  Lubis seems to forget that he exposed himself to arrest and conviction for violating immigration laws simply by harboring the victims for his profit and financial gain.  With that liability hanging over his head, Lubis had strong incentive to threaten the women, and thereby prevent them from reporting his crimes to the police.

Furthermore Lubis's threats were designed to benefit Lubis financially insofar as the threats created a paralyzing fear, which kept the women from fleeing.  Once the victims were rescued by the FBI and ICE, Lubis and Siregar lost their primary source of income.  The defendants were no longer able to extract money from the victims.  Since Lubis was already committing federal felonies by harboring the victims for financial gain, Lubis had every incentive to threaten the victims so as to prevent discovery of his and Siregar's crimes.

[31]    All the other victims refer to this woman as "Mujiyati."

Endang noted that in the summer of 2008, Lubis collected $1,000 from each of the women, for "travel," and that Lubis has not returned this money to Endang. Siregar told Endang that the money was being collected in case they needed airfare to return to Indonesia, but Endang had no plans to return to Indonesia anytime soon and she did not want to give them this money. She gave the money to avoid trouble with Lubis.

**Sexual Advances.** Endang mentioned that Lubis tried to kiss and fondle her and the other victims. Endang also suspected that Lubis molested Turiah while the two worked on Lubis's newspaper route. She noted that Nur and Turiah used to help Lubis with the newspapers, but later Lubis would take just Turiah, which allowed Lubis to be alone with Turiah.

**Desire to Leave.** Endang said that she dreamed about learning to drive a car and being able to go to restaurants and stores on her own. She said she wanted to leave Lubis but stayed because she feared that he would find her and force her to return to Indonesia and because she did not have her passport.

Endang said that when Eva left, the other victims were happy for her and this made Endang think of escaping. Endang said that if she had possessed the ability to run away, she would have done so.

### G.    Hanik Muflikhatin M. Noor

Hanik is an Indonesian woman whose husband and two children still reside in Indonesia. She worked for Lubis and Siregar from May 2006 to October 26, 2008.

**Recruitment.** Hanik came to the United States in 2001 to work as a maid for a Saudi family. One day, while cleaning the outside balcony of her employer's home, Lubis drove up and began talking to her. Lubis asked Hanik how much her employer was paying her. Hanik replied that they

36

paid her $250 per month.  Lubis said he could arrange for her to work for an American family that

would pay her more.  The Saudi family was getting ready to move to Brunei, and Hanik could not

get a visa for Brunei, so she decided to accept Lubis's offer.  Hanik moved into Lubis's house in

May 2006.

**Work.**  Hanik had a number of jobs while she lived with Lubis and Siregar.

When Hanik first came to live with Lubis in May 2006, she did not have a job.  So, three

days per week, for about four hours per day, she assisted Siregar in cleaning houses.  Siregar never

paid Hanik for this work.

Hanik first worked for an Iranian family, whose name she does not know, from June 2006

to July or August 2006.   Siregar took Hanik to the interview at the Iranian's house in Virginia and

arranged the job for her.

In July 2006, Siti Siregar took Hanik for an interview at the Olans' house in Potomac,

Maryland.  The Olans agreed to hire Hanik and she worked for the Olans for 1.5 years.  Hanik

cleaned the Olans' home and watched their children.  Hanik does not speak English very well and

she believed that the Olans were not happy with her work.  The Olans' asked Siti if another woman

could work for them and Siti arranged for another Indonesian woman, Endang, to take Hanik's place

at the Olans' residence.  When she first began working for the Olans, they paid her $275 per week,

but over time the Olans increased her salary to $350 per week.[32]

After leaving the Olans, Hanik spent about two months filling in at the Greenberg residence

for another woman who lived in Lubis and Siregar's basement.

---

[32]  In contrast, Hanik estimates that in Indonesia she could make $20 to $30 per month.

37

The Greenbergs placed an advertisement in the paper and the Fischer family responded. Hanik had an interview with the Fischers which Siti Siregar also attended. Hanik then began working for the Fischer family from February 2008 to October 2008. The Fischers paid Hanik about $375 per week, cash.[33] Hanik lived with all three of her employers Monday through Friday, and resided at Lubis's house on the weekends.

**Uncompensated Labor for Siregar.** On Saturdays, Siregar would take Hanik, Endang, Nur, and Umi to the home of Mr. Palmer, a Washington, D.C. attorney. The women would then work for around four to five hours cleaning the house and doing the Palmers' laundry. Siregar never paid Hanik for this work and Hanik does not believe that Siregar paid any of the other women either. Also, as noted above, when Hanik first came to live with Lubis in May 2006, she assisted Siregar in cleaning houses and Siregar never paid her for her labors.

**Finances and Incidental Expenses.** Hanik paid Lubis and Siregar $375 per month; $250 was for "rent," food, water, and to watch television, and $125 was ostensibly for transportation. As with the other women, Lubis prohibited Hanik from sending money to Indonesia herself, and instead required that all funds be sent via Lubis. Lubis imposed a 10 percent to 15 percent fee when the money was sent. In the spring, he also required the women to pay another 10 percent "tax" for all moneys they had remitted to Indonesia the previous year.

**Living Conditions.** During the week, at her employer's house, Hanik had her own bedroom with her own bed, her own television, and her own bathroom. On the weekends, Hanik lived in

---

[33] At the interview with Mrs. Fischer, Siregar told Mrs. Fischer that Hanik should be paid in cash because the women do not have documents and could not cash a check.

Lubis's basement and shared a bed with another victim.  She also shared one bathroom with the six other women who resided in Lubis's basement.

**Lubis's Rules and Restrictions.**  According to Hanik, Lubis and Siregar promulgated a number of rules for the victims:

1.  all of the victims had to return to Lubis's house on the weekend;

2.  nobody (except Umar, who held a supervisory position in Lubis's organization) was allowed to go out unaccompanied by other women or Lubis's family;

3.  whispering or talking quietly among themselves was prohibited;[34]

4.  owning cellular telephones was prohibited;

5.  the victims were not allowed to have visitors at the house;

6.  money could be sent to Indonesia only through Lubis, and the victims could not send money on their own (except for Umar);

7.  there was an implied rule that the victims were to "tip" Lubis's children every month;

8.  the victims could not live somewhere else, such as at their employer's house;

9.  the victims could not work for another employer that Lubis had not approved;

10.  the women (other than Umar) were not allowed to take public transportation, and thus the women had to obtain transportation from Lubis and Siti;

---

[34]  In "Defendant's Position on Sentencing Factors," Lubis argues that the rules he and Siregar imposed were designed for the "benefit" of the women.  Position at 5. What possible benefit would the victims enjoy by prohibiting private conversation?  The sole benefit was to Lubis and Siregar, since this rule hindered escape plans.

11.  the victims were not allowed to socialize with anyone who did not reside in Lubis's house;[35]

12.  the victims, even those who were single, were not allowed to date or have boyfriends;

13.  Lubis instructed the women that they were not allowed to tell client families about anything that happened at Lubis's house;

14.  the women were not allowed to speak to the neighbors;[36] and

15.  in the middle of 2008, after Lubis sent one woman back to Indonesia for attempting to escape, he imposed a rule that all women deposit with him $1,000 for "travel."[37]

**Passport.**  When Hanik first came to live with Lubis, he asked to see her passport and he never returned it.  Hanik stated that one of the reasons she did not leave Lubis was the fact that she

---

[35]  Lubis, on page 5 of "Defendant's Position on Sentencing Factors," concedes that the women "spoke little English and did not know many people other than the Lubis family, the other women at the house, and their employers."  The rules Lubis and Siregar imposed were designed to ensure that the women did not meet anyone who might help them escape Lubis and Siregar's clutches.

[36]  Again, Lubis claims that the rules he imposed were for the benefit of the women in his basement.  He fails to explain, however, how a prohibition on speaking to neighbors benefitted the victims.  But it is obvious how such a rule would benefit Lubis and his attempts to prevent the victims from escaping.

[37]  In the summer of 2008, Siti told Hanik that someone had called Lubis's house and left messages on Lubis's answering machine, in the Indonesian language, informing Lubis that he had illegal aliens in his basement and warning him that federal agents were watching him.  After these messages, Lubis returned the $1,000 "travel" money to most of the women.  He did not return Hanik and Endang's money, however.  Hanik never asked for the money back, however, as she thought this would be rude, would suggest that she did not trust Lubis, and would cause her more problems.  Hanik understood the deposit to be a threat: Lubis and Siregar could use this money to send a victim back to Indonesia.  This gave the victims extra incentive to obey Siregar and Lubis.

did not have her passport and Lubis had told her that if the police caught her without her passport, they would arrest her and imprison her.

**Threats and Climate of Fear.**

THREATS TO SEND THEM BACK TO INDONESIA.  According to Hanik, Lubis told the victims on multiple occasions that if they disobeyed or ran away from him, he would send them back to Indonesia.  According to Hanik, in 2007, Lubis in fact made good on his threat and sent one woman back to Indonesia.  The woman's name was "Yati," which is short for "Mujiyati."  Siregar was looking for something in the basement and came across clothes that Mujiyati had packed.  Siregar perceived that Mujiyati was trying to escape, so Lubis and Siregar sent Mujiyati back to Indonesia.  Many of the women went to the airport to see Mujiyati off, and Hanik said Mujiyati was crying and protested that she had not been trying to run away.

THREATS OF ARREST.  Lubis and Siti also told the Hanik that if she left the house the police would come to get her because she did not have her passport.  Hanik understood that the police would arrest her and imprison her.

FITS OF ANGER.  Hanik also related that she feared Lubis based on his aggressive outbursts, which included throwing and breaking objects. Various things would set Lubis off, including not waiting by the door when it was time to be picked up at their employer's house.

ERRATIC DRIVING.  According to Hanik, Lubis would also drive erratically and recklessly in an effort to scare the women.  Hanik said that the erratic driving seemed to upset Eva terribly and that after Eva left, Lubis seldom drove recklessly.

**Exploiting Islamic and Indonesian Culture**.  Lubis would also berate the women for being ungrateful to him and would remind them that he had done so much for them and that they should

41

be grateful for his kindness to them.  Umar also would remind the women of their duty to Lubis because they resided in his house.

**Sexual Advances**.  Hanik claims that Lubis frequently would try to kiss her and try to hold her hand and hug her.  She said she always pushed him away, which he did not like.  After she repeatedly did so, Lubis began to tell the other women that Hanik was a lesbian.  Hanik—a married Moslem woman living without any privacy and sleeping in the same bed with other women—found this hurtful and offensive.

Hanik claims she does not know if Lubis was having sex with any of the women, but she suspects he was doing something with Turiah based on the fact that Turiah was often alone with Lubis, and Lubis made sexual advances when he was alone with a victim.[38]

**Desire to Leave.**  Hanik said that at first she did not mind staying at Lubis and Siregar's house, but by May 2007 she wanted to leave.  Hanik believed, however, that she was not free to leave.  In particular, she feared Lubis and what he would do if she left, and she did not have her passport, which she needed.  Indeed, Hanik said she was fearful every time she returned to Lubis's house and she related that all of the other women have discussed with her their fears of Lubis.  Hanik stated that she would rather have spent her weekends at the Fischers' house, but she was too afraid of Lubis to ask the Fischers if this was possible.

---

[38]  According to some of the victims, Lubis would brag that women found him irresistible.

### H.    Umi Maskurotin

Umi Maskurotin ("Umi") is an Indonesian woman who worked for Lubis from November 2007 to October 26, 2008.  She is from a rural area in Java and uses the money she earns to support her husband and daughter who still reside in Indonesia.  Umi attended some high school in Java.

**Recruitment.**  Umi came to the United States in August 2007 to work for a Jordanian family.  They required her to work seven days per week.  Her contract stated that she would be paid $1,400 per month, but the Jordanians paid her only $275 per month.

Umi met Lubis at a bus stop while she was taking the Jordanian children to school in Alexandria, Virginia.[39]  Lubis promised Umi that if she came to live and work for him she would earn $350 per week.  She moved into Lubis and Siregar's basement in November 2007.

**Work.**  For two months, Lubis and Siregar were unable to find full-time work for Umi.  Then, in January 2008, Siregar arranged for Umi to work for the Blizzard family.  When Umi interviewed with the Blizzards, Siregar instructed the Blizzards to pay Umi cash.  After the Blizzards left the area, Siregar and Umar arranged for Umi to work for the Reichbach family.

**Siregar Prohibits Umi from Leaving.**  Umi worked for the Blizzards from January 2008 to around September 2008 when the Blizzards moved to Florida.  The Blizzards asked Umi to move to Florida.  Umi liked the Blizzards and she wanted to move with them, but she declined the offer because Siregar had told Umi that she had to stay and work for Lubis and Siregar.

---

[39]    Lubis previously worked at the Indonesian Embassy as a driver and it is possible that he uses embassy contacts to inform him when Indonesian women come to the D.C. area.

**Lubis Prohibits Umi from Leaving.**  The family that purchased the Blizzards' residence also asked Umi to live with them and promised to sponsor her for a visa.  Lubis, however, told Umi that she could not accept this offer.

**Uncompensated Labor for Siregar and Lubis.**  Umi related that on Saturdays, she and other victims assisted Siregar for about five hours in cleaning a house in the District of Columbia.  In addition, every Saturday, for one to two hours, Umi would iron the Lubis family's clothes.  The defendants never compensated Umi for her labor.

**Finances and Incidental Expenses.**  When Umi wanted to send money to her family in Indonesia, Lubis required that he transmit the money.  For every $1,000 that Umi sent, Lubis generally charged $100 plus $50 for gas.[40]  Additionally, Lubis told Umi that in spring 2009, she would be required to pay "taxes" equaling 10 percent of the money she sent to Indonesia in 2008.  Furthermore, Lubis sold the women telephone cards for long-distance phone calls.

**Living Conditions.**  On the weekends, Umi lived in Lubis and Siregar's basement and shared a bed with Turiah and Nur.  She also shared one bathroom with the six other women who lived in the basement with her.  In contrast, when she lived at the Blizzards' residence she had her own bedroom and bathroom and her own television.

**Siregar and Lubis's Rules and Restrictions on Freedom.**  Umi noted that Lubis and Siregar imposed a number of rules on the victims:

1.  all of the victims had to return to Lubis and Siregar's house on the weekends (unless the employer required them to work on a particular weekend);

---

[40]  In fairness to Lubis, Umi recalled one instance where she paid Lubis only $80 to send $1,000 to Indonesia plus $30 for gas.

2.  the victims were not allowed to leave Lubis and Siregar and reside someplace else on the weekends;

3.  money sent to Indonesia had to be sent by Lubis (for a fee);

4.  the victims were not allowed to have friends other than people who lived in the house;[41]

5.  the victims were not allowed to whisper or talk softly among themselves;[42]

6.  cellular telephones were prohibited;[43]

7.  Lubis and Siregar would hold all passports and the women were not allowed to hold their own passports; and

8.  dating and boyfriends were prohibited.

**Lack of Freedom to Leave.**  Around January 2008, Siregar told Umi that she could not work for anyone besides Lubis and Siregar and had to live with them.  From that time on, Umi was afraid and she knew that she was not free to leave.

Also, Lubis threatened the victims to discourage them from leaving.  For example, Lubis repeatedly told the victims that if they left him, he would find them and once he did, he would force them to come back and/or "send them home."

---

[41]  Umi understood that this rule was designed to prevent the victims from making friends who might help them escape.

[42]  Umi offered that Lubis and Siregar were afraid that whispering or private conversations would lead to the victims planning an escape.

[43]  When Umi came to Lubis and Siregar's house she had a cellular telephone.  Lubis and Siregar would not allow Umi to pay the bill for her phone and the telephone company disconnected service.  Umi understood that this rule was designed to inhibit contact with those who might help her escape.

Umi said that she wanted to run away but that she did not know anyone in the United States to whom she could flee. She also was afraid to call the police because she knew that she was not lawfully in the United States. She believed that if she called the police she would be arrested. Indeed, Lubis told the victims that if the police caught them they would be imprisoned and then deported. This discouraged Umi from fleeing.

Umi also asked Lubis if she could stay at the Blizzards' home on the weekends because living conditions were much better there and she had privacy including her own bedroom and bathroom. Lubis, however, told Umi that she had to come back to his basement on the weekends. Lubis explained that it would violate United States law for her to stay with the Blizzards on the weekend. Umi suspected that this was simply Lubis's rule so that he could continue to get money from the women, but Umi did not argue with Lubis because she was afraid of him.

**Lubis's Confiscation of Umi's Passport.** When Umi left the Jordanian family, the family transmitted Umi's passport to the Indonesian embassy. Lubis drove Umi to the embassy to retrieve her passport, but once she retrieved it, Umar instructed Umi that she had to surrender her passport to Lubis. Umi wanted to keep her own passport, particularly because this was her only form of identification. She did not say anything to Lubis about this, however, because, based on her experience with the Jordanians, she thought there was a rule that permitted employers to hold an employee's passport. Umi believed that it would have been easier to leave if she had possession of her passport.

## II.    Analysis

### A.    Large Number of Vulnerable Victims

The Probation Office erred by failing to include a four-level enhancement in light of the large number of vulnerable victims involved in this case.

Section 3A1.1(b)(2) of the United States Sentencing Guidelines provides for a four-level increase if the offense involved a large number of vulnerable victims. A "vulnerable victim" is any person who is a "victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.2 Application Note 2. This "'vulnerable victim' sentencing enhancement is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal. Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them." United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999); see United States v. Blake, 81 F.3d 498, 504 (4th Cir. 1996). For this enhancement to apply, the United States must show that there is some connection between the victims' vulnerabilities and the defendants' selection of these victims. United States v. Elkins, 296 Fed. Appx. 306, 308 (4th Cir. 2008).

The vulnerable victim enhancement can be appropriate in alien harboring cases. United States v. Calimlim, 538 F.3d 706, 716 (7th Cir. 2008); United States v. Bonetti, 277 F.3d 441, 450 (4th Cir. 2002). The enhancement for exploiting vulnerable victims is also frequently applicable to cases involving human trafficking and involuntary servitude. See Calimlim, 538 F.3d at 716; United States v. Verapol, 312 F.3d 1128, 1133 (9th Cir. 2002).

In this case, the defendants had a scheme whereby they would seek out unsophisticated Indonesian women who generally were working as domestic help for Middle Eastern diplomats and

their families.  The defendants, who also hail from Indonesia, would then entice the victims with promises of higher pay and less work.  Once the defendants had the victims in their home, they retained control over them by means of threats, passport confiscation, and a scheme of psychological coercion, including sexual abuse of two of the victims and attempts to kiss and inappropriately touch most of the victims.[44]  For example, Lubis and Siregar confiscated the victims' passports and tightly controlled the victims' movements.[45]

As noted above, the defendants also imposed a number of rules on the victims.  Indeed, in the Statement of Facts, Lubis conceded that he "and his wife imposed various rules on the Indonesian women who resided in their basement."  Lubis Stmnt. of Facts ¶ 5.  These ordinances included a rule that the victims could not use public transportation, could not use or own cellular telephones, could not have American friends or socialize with Americans (except for friends of the defendants), and that on the weekends the victims had to reside in the basement of the defendants' house unless they had work elsewhere.[46]  The defendants also used Srimunah Mustakim Umar to spy on the victims, collect money from them, inform the defendants of any acts of disobedience or escape plots, and ensure that the victims complied with the defendants' rules.

---

[44]  Lubis was sufficiently confident of his power over the victims that he sexually abused two of them and attempted to kiss and touch inappropriately many others.  This sexual abuse, therefore, is prima facie evidence of the vulnerability of at least the two sexual abuse victims and those whom he touched.

[45]  In the Statement of Facts which Siregar stipulated was "true and accurate," Siregar admitted that she had secreted the victims' passports in her son's bedroom and that she lied to federal agents when she told them that the victims had asked Siregar to retain these passports. Siregar Stmnt. of Facts ¶¶ 11, 12.

[46]  Incidentally, although the victims paid what the defendants called "rent," none of the victims had a key to the "home" that they rented nor did they have a lease or rental agreement.

The defendants also knew that the victims were reared according to Indonesian and Islamic culture, and that in these cultures women generally are subservient to men and must defer to men.[47] Furthermore, according to this culture, when women are living away from their husbands or fathers, they are bound to respect and obey the father figure with whom they reside, which in this case was Soripada Lubis.

The Lubis and Siregar's scheme was dependent upon the substantial vulnerability of the victims, a vulnerability which is atypical of the average alien harboring case. Specifically, the defendants exploited the poverty of the Indonesian victims and the fact that the victims' families were depending on the money that the victims would periodically remit home. The victims' poverty itself is a vulnerability that warrants imposition of the vulnerable victim enhancement. United States v. Wells, 257 Fed. Appx. 658, 661 (4th Cir. 2007) (noting that district court applied vulnerable victim enhancement where victims "were disadvantaged economically" and were "uneducated"); United States v. Hersh, 297 F.3d 1233, 1241 n.9 (11th Cir. 2002) (noting that the vulnerable victim enhancement is appropriate where the defendant targeted victims from "third-world countries" living in poverty).

Related to the victims' poverty is the fact that the defendant would threaten the women with arrest and deportation knowing full well that arrest and deportation would deny the victims the

---

[47] MATTHEW LIPPMAN, ET AL., ISLAMIC CRIMINAL LAW AND PROCEDURE 61 (1988) ("Women have an inferior status. They are prohibited from serving as witnesses, although in certain cases two female witnesses may substitute for a man."); id., at 69 ("Witnesses must be male Muslims, although certain jurists, in isolated instances (for example, involving property or employment), permit the testimony of two female witnesses to substitute for that of a single male witness. Women are disqualified in the generality of cases because they are viewed as having 'weakness of understanding, want of memory, and incapacity of governing.'").

ability to send money home to their families.[48]  As the defendant also knew, the victims' families

were dependent upon the money the victims remitted to Indonesia, as the defendant has visited some

of the victims' families in Indonesia and was the conduit for the remittances.[49]   This fear of

deportation and the related financial desperation made it much easier for the defendants to control

the victims and substantially aided them in harboring the aliens for financial gain and involuntary

servitude.   For these reasons alone, the victims were vulnerable and the vulnerable victim

enhancement is applicable here.   See United States v. Garza, 429 F.3d 165, 174 (5th Cir. 2005)

(holding that the victims were unusually vulnerable because of their "poverty, language problems,

and fears of deportation");  United States v. Borst, 62 F.3d 43, 47 (2d Cir. 1995) (holding that a

vulnerable victim enhancement is "particularly appropriate when . . . the success of the defendant's

criminal scheme depended on the victim's financial desperation").

The defendants also preyed upon the victims' lack of sophistication and schooling.  Although

all of the victims had attended some grammar school and some had completed grammar and middle

school in Indonesia, generally they were from rural parts of Java, and were unfamiliar with the

United States and the integrity of most United States law enforcement personnel.   Most of the

---

[48]  See Siregar Stmnt. of Facts ¶ 6.

[49]  See Lubis Stmnt. of Facts ¶ 5 (Lubis charged the women "to transfer money to
Indonesia, which the Indonesian women paid to the defendants in cash").   Indeed, one of the
defendants' rules was that the victims could not send money to Indonesia except through Lubis
or Siregar.   As discussed above, Lubis imposed a fee for this service which generally amounted
to 10 percent of the amount a victim sent to Indonesia.

victims have learned a number of English words but generally they do not speak or understand the English language.[50]

Lubis and Siregar exploited this lack of sophistication to keep the victims residing with them and to scare the victims into believing that if they escaped, the police would arrest, imprison, and deport the victims. Creating this fear in the victims ensured that the victims would not report the defendants to the police and that the victims would not seek assistance from U.S. law enforcement.

The defendants also used the victims' ignorance to extract money from them. For example, in the spring, when most Americans file their tax returns, Lubis and Siregar required the victims to pay a "tax" for money sent to Indonesia, which Lubis stated or implied was charged by the U.S. government for such transactions. Of course, Lubis and Siregar were simply pocketing this money. Similarly, Lubis told Tini that she could not send money to Indonesia by herself and instead had to employ Lubis to perform this task. After she escaped from Lubis, however, Tini learned that Lubis had lied to her and she was able to send money to Indonesia without paying his fee of between 10 and 15 percent. Had the victims been more sophisticated, they would not have been so vulnerable to these facets of the defendants' scheme.

The victims' lack of education and their unsophisticated nature, therefore, are also proper bases for the vulnerable victim enhancement. United States v. Hawes, 523 F.3d 245, 248 (3d Cir. 2008) (noting the applicability of the vulnerable victim enhancement where the victims were "unsophisticated"); United States v. Williams, 21 Fed. Appx. 824, 826 (10th Cir. 2001) (holding that the vulnerable victim enhancement is appropriate where the victims were "unsophisticated"); United

---

[50] Lubis, on page 5 of "Defendant's Position on Sentencing Factors," concedes that the women "spoke little English."

States v. Medrano, 241 F.3d 740, 745 (9th Cir. 2001) (holding that the vulnerable victim enhancement was warranted where the victims were "unsophisticated"); Grimes, 173 F.3d at 637 (noting that the vulnerable victim enhancement was appropriate because the victim was a "very unsophisticated" person).

As to the "large number" of victims, Section 3A1.1 of the Sentencing Guidelines does not define the term "large number of vulnerable victims," but in United States v. Kaufman, the United States Court of Appeals for the Tenth Circuit held that ten victims would certainly constitute a "large number." 546 F.3d 1242, 1268-69 (10th Cir. 2008).

In the instant case, the United States identified eight victims, and Lubis agreed in the Statement of Facts that he harbored these eight victims. Lubis Stmnt. of Facts ¶ 1. Eight vulnerable victims is a "large number" for purposes of the vulnerable victim enhancement. Additionally, however, the United States has identified by name at least five other vulnerable victims who were held by the defendant and his wife, including Yani Bt Mahali Abdullah, Lilissuryani Bt Miharja Wanta, "Mujiyati," Munawaroh Bt Abdul Kham Toha, and Nengsih Musa. Additionally, although the United States does not know the names of all of the other victims, Siregar admitted in her Statement of Facts that she "and her husband kept more than twenty Indonesian women" in the basement of their home. Siregar Stmnt. of Facts ¶ 3. The crimes committed by Lubis, therefore, obviously involved a large number of vulnerable victims.

In conclusion, the defendant was well aware of the many vulnerabilities of the victims. Indeed, he chose them as victims precisely because of the victims' vulnerabilities. The combination of all of these various vulnerabilities and the large number of vulnerable victims calls for the

imposition of the vulnerable victim enhancement and an increase in Lubis's offense level by four levels.  See U.S.S.G. § 3A1.1(b)(2).

**B.    Lubis's Organizer and Leader Role in the Offense**

The Probation Office also erred by failing to include a four-level enhancement in light of Lubis's role of organizer and leader of criminal activity that involved five or more participants or was otherwise extensive.

Section 3B1.1(a) of the Sentencing Guidelines states that if the "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."  U.S.S.G. § 3B1.1(a).  Thus, there are two ways that the requirements for this enhancement can be satisfied.

> For § 3B1.1(a) to apply, the criminal activity that the defendant led or organized must have involved five or more participants or been extensive. § 3B1.1(a). The disjunctive language of § 3B1.1(a) is important—a criminal activity may be extensive even if it does not involve five or more participants. Id. cmt. n. 3 ("In assessing whether [a criminal activity] is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

United States v. Arbour, 559 F.3d 50, 53  (1st Cir. 2009); see also United States v. Laboy, 351 F.3d 578, 585 n. 10 (1st Cir. 2003) ("The 'five or more participants' and 'otherwise extensive' elements are alternative means of finding the required scope under § 3B1.1.").

Importantly, "a court may look beyond the specific crimes for which the defendant was convicted when determining whether the criminal activity satisfied the numerosity or extensiveness requirement."  Arbour, 559 F.3d at 54.  "The court may consider all 'relevant conduct' surrounding the crimes of conviction."  Id.

_____    **1.    Five or More Participants**

In this case, clearly there were more than five participants in the defendants' scheme.  The participants included:

1. Soripada Lubis;[51]

2. Siti Siregar (the defendant's wife, who played a major role in the offense);

3. Ratna Siregar (Siti Siregar's sister, who helped find jobs for some of the victims and who also sometimes resided in Lubis and Siregar's house);

4. Srimunah Mustakim Umar  (a supervisor of the victims who collected the money, helped Lubis and Siregar find employment for the victims, and spied on the victims for the defendants);

5. The individual in Indonesia to whom Lubis sent remittances, identified by Soripada Lubis as "Mumi Lubis."

6.  Parulian Lubis (who lived in Indonesia and to whom Lubis also remitted money);

7.  Nurmaya Sari (Lubis's niece who also resided at his house on weekends);

8.  Irna Lubis (Lubis and Siregar's daughter who resided in their house, who admitted knowing that the women were not lawfully residing in the United States, and to whom the victims were coerced to give "gifts" and "tips"); and

9.  Andi Lubis (Lubis and Siregar's son who also resided in their house and to whom the victims were coerced to give "gifts" and "tips").

---

[51]   The Fourth Circuit and every other Court of Appeals that has addressed the issue has held that, for purposes of U.S.S.G. § 3B1.1, the defendant himself should be counted as a "participant" when calculating the number of participants involved in a criminal venture.  United States v. Stone, 85 Fed. Appx. 925, 939 (4th Cir. 2004);  United States v. Fells, 920 F.2d 1179, 1182 (4th Cir. 1990); see United States v. Gerstein, 104 F.3d 973, 979 (7th Cir. 1997); United States v. Rostoff, 53 F.3d 398, 413 n.14 (1st Cir. 1995); United States v. Gadison, 8 F.3d 186, 195 (5th Cir. 1993); United States v. Kenyon, 7 F.3d 783, 785-86 (8th Cir. 1993).

Accordingly, U.S. Probation should have found U.S.S.G. § 3B1.1(a) applicable and increased Lubis's offense level by four levels, instead of just two levels.

Furthermore, each of the victims identified in Lubis and Siregar's Information, Statement of Facts, and Plea Agreement is also a participant in the alien harboring in that each victim knew she was in the United States unlawfully,[52] although each victim was obviously an unwilling participant in the involuntary servitude aspect of the case. These participants include:

    10. Tatik Wuryanti Djarno ("Eva");

    11. Supartini Katmo ("Tini");

    12. Susi Maedin Gomez;

    13. Umi Maskurotin;

    14. Hanik Muflikhatin M. Noor;

    15. Turiyah Tarjuki;

    16. Heti Binti Pahru ("Endang"); and

    17. Nuryati Lili.

Furthermore, other victims who lived in the defendants' basement and worked for other employers during the week are also participants. These include:

    18. Yani Bt Mahali Abdullah;

    19. Lilissuryani Bt Miharja Wanta;

---

[52] "To be included as a participant, one must be 'criminally responsible for the commission of the offense.'" United States v. Fells, 920 F.2d 1179, 1182 (4th Cir. 1990). Each of the victims was partially responsible for Lubis's commission of alien harboring up to and until the time she wanted to leave Lubis and Lubis and Siregar prevented her from leaving. That is, each victim initially came voluntarily to live with and work for Lubis and Siregar despite knowing that this was not permitted under the terms of their visas.

20. "Mujiyati;"

21.  Munawaroh Bt Abdul Kham Toha; and

22. Nengsih Musa.

The various employers are also participants insofar as they knew or were willfully blind to the fact that the victims were illegal aliens and that Lubis harbored them.  Each victim had at least one employer, and some had over four.  These employers include:

23. Michelle Banner;

24. Fred Banner;

25. Melissa Banner;

26. Leonard Banner;

27. Susan Olan;

28. Dr. Wayne Olan;

29. Dr. Paul Cohen;

30. Alan K. Palmer;[53]

31. Tricia Weiss;

32. Andrew Weiss;

33. James Cavanaugh;[54]

34. Julie Polsky;

---

[53]  Notably, Lubis submitted a letter to this Court written by Mr. Palmer, an attorney with Kay Scholer, LLP, in which Mr. Palmer writes that Siregar and other "assistants" of Siregar clean his house.  Palmer writes:  "At times, as I've said, Mr. Lubis's wife (and on occasion Mr. Lubis himself) has been accompanied by one or two 'assistant' cleaning ladies, who like both Mr. Lubis and his wife are of Indonesian background."

[54]  Cavanaugh owns a home in Arlington which Siregar and some of the victims cleaned.

56

35. James Polsky;

36. Lorraine Fischer;

37. Gennifer Reichbach;

38. Michael Reichbach;

39. Ellen Cohen Ottenstein;

40. Grant Ottenstein;

41. Alison Schaefer;

42. Steve Schaefer;

43. Linda Miller;

44. Billie Fahat;

45. Maggie Shannon;

46. Brauna Martin;

47. James Martin;

48. Mark Blizzard;

49. Alice Blizzard;

50. Valerie Lederberg;

51. Jill Schwartz;

52. Daniel Kracov;

53. Eileen Kracov; and

54. Randi Greenberg.

Because there were at least fifty-four participants, this enhancement is applicable to the calculation of Lubis's offense level.

### 2.     Lubis and Siregar's Scheme was "Otherwise Extensive"

Alternatively, Section 3B1.1 is applicable regardless of the large number of participants because the criminal activity was "otherwise extensive" based on the organization, duration, and the large number of people involved.  When determining whether a criminal activity is extensive, courts consider "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme."  Arbour, 559 F.3d at 54; United States v. Harvey, 532 F.3d 326, 338 (4th Cir. 2008) ("The Application Note to U.S.S.G. § 3B1.1 explains that, in determining if a criminal activity is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered, including outsiders who provided unwitting services and thus do not qualify as 'participants.' U.S.S.G. § 3B1.1 cmt. n. 3 (2000).").

Here, Lubis's criminal activities spanned more than eight years, involved criminal actions committed in two nations, and involved more than twenty aliens and over fifty client employers.  Therefore, it is readily apparent that Lubis's criminal activity was "otherwise extensive."  For both of these reasons, then, Lubis was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, and thus pursuant to U.S.S.G. § 3B1.1(a), his offense level should be increased four levels.  This results in an Adjusted Offense Level of 26 and a Total Offense Level of 23.

## III.     Conclusion

In light of the seriousness of the offenses committed by Siregar and the § 3553(a) factors, this Court should impose on Siregar the maximum sentence suggested by the Sentencing Guidelines.

As for Lubis, his threats of violence and the sexual abuse he perpetrated demonstrate that he continues to be a danger to the community and that only a long period of incarceration can adequately punish him for his crimes.  Because the Sentencing Guidelines do not take into consideration the depravity of Lubis's actions and his sexual abuse of at least two victims, the Court should impose on Lubis an upward variance sentence in excess of the 46 to 57 months  (3.83 years to 4.75 years) of imprisonment suggested by the Sentencing Guidelines.


Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY


By:  _____/s/_____
James P. Gillis
Virginia Bar No. 65055
Assistant United States Attorney
Justin W. Williams United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 549-5201 (fax)
james.p.gillis@usdoj.gov

Michael J. Frank
Trial Attorney
Civil Rights Division
United States Department of Justice

59

## Certificate of Service

I hereby certify that on June 16, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Mr. Kevin Brehm
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22231
kevin_brehm@fd.org
Attorney for Soripada Lubis

Robert F. Horan, III
Hart & Horan, P.C.
10505 Judicial Drive, Suite 101
Fairfax, VA 22030
Attorney for Siti Chadidjah Siregar

                                        /s/
                        James P. Gillis
                        Virginia Bar No. 65055
                        Assistant United States Attorney
                        Justin W. Williams United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA  22314
                        (703) 299-3700
                        (703) 549-5201 (fax)
                        james.p.gillis@usdoj.gov