IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SORIPADA LUBIS and | ) | No. 1:09-CR-91-GBL |
| | ) | |
| SITI CHADIDJAH SIREGAR, | ) | No. 1:09-CR-92-GBL |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF THE UNITED STATES WITH RESPECT TO RESTITUTION

The United States of America respectfully submits this Memorandum to assist this Court in its assessment of restitution with respect to the July 1, 2009 sentencing of defendants Soripada Lubis ("Lubis") and Siti Chadidjah Siregar ("Siregar"). The Government respectfully moves the Court to impose an order holding the defendants jointly and severally liable for restitution in amounts calculated below.[1]

**A.     Basis for Restitution**

Both the Victim and Witness Protection Act of 1982 and the Mandatory Victims Restitution Act "authorize a sentencing court to award restitution if the parties have so agreed in a plea agreement." United States v. Dailey, 189 Fed. Appx. 212, 216 n.3 (4th Cir. 2006) (citing 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3)); United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006). Section 3663A(a)(3) "specifically permits the defendant to undertake additional restitution obligations via a plea agreement." United States v. Sloan, 505 F.3d 685, 695 (7th Cir. 2007); Davenport, 445 F.3d at 374; United States v. Rand, 403 F.3d 489, 494 (7th Cir. 2005).

---

[1] The United States will submit a proposed Restitution Judgment at sentencing.

Here, both defendants agreed to pay restitution in the amount this Court orders.[2] Specifically, paragraph 11 of Lubis's plea agreement and paragraph 11 of Siregar's plea agreement states that "the defendant agrees to pay restitution for offenses other than the offenses of conviction to the following persons, but only to the extent ordered by the court . . . ." The respective plea agreements then list the eight victims, each of whom is discussed below.

**B.     Restitution Calculation**

Because Section 3663A(a)(3) permits the defendants to consent to restitution, and the defendants in this case have so consented, the only issue for this Court is the amount of restitution to be assessed. The United States bears the burden of proving the extent of losses suffered by each victim—and, thus, the appropriate amount of restitution—by a preponderance of the evidence. United States v. James, 564 F.3d 1237, 1248 (10th Cir. 2009); United States v. Harvey, 532 F.3d 326, 339 (4th Cir. 2008). The calculations below provide very conservative estimates of the losses each victim suffered as a result of the defendants' criminal conduct, relying only on readily calculable payments the victims made to the defendants in connection with the defendants' scheme.[3] The calculations exclude the losses resulting from the uncompensated labor the defendants extracted from the victims as well as losses resulting from additional charges the defendants imposed on the victims. These additional losses, while more difficult to quantify, are also properly considered as

---

[2] The Presentence Investigative Report noted that the defendants agreed to pay restitution and that restitution amounts would be determined by the Court. Siregar Presentence Report ¶¶ 8, 68, 75; Lubis Presentence Report ¶¶ 11, 68, 75.

[3] "So long as the basis for reasonable approximations is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." United States v. Savoie, 958 F.2d 612, 617 (1st Cir. 1993).

losses the victims sustained as a result of the defendants' criminal scheme.

    **1.**        **Susi Maedin-Gomez ($ 2,700)**

Susi was in the service of the defendants from approximately Spring 2000 to Spring 2001 (approximately 9 months), although she is not sure about the exact dates. She paid the defendants $300 per month for "rent" for approximately for 9 months. 9 months x $300 per month = $2,700. This calculation errs on the conservative side, as it does not include the incidental fees that the defendants demanded of Susi nor the free labor that she provided for the defendants.

    **2.**        **Tatik Wuryanti Djarno ("Eva") ($ 20,650)**

Eva was held by the defendants from October 2001 to July 2007 (70 months). "Rent" increased over time from $250 per month in 2001. By July 2007, Eva was paying $350 per month.

```
47 months x $275 per month = $ 12,925
13 months x $325 per month = $  4,225
10 months x $350 per month = $  3,500
                             $ 20,650
```

Again, this calculation of the victim's losses is extremely conservative because it does not include incidental fees and "taxes" that the defendants regularly required Eva to pay or the free labor that Eva provided for the defendants.

    **3.**        **Nuryati Lili ("Nur") ($ 19,900)**

Nur was held by the defendants from January 6, 2002 to October 26, 2008 (82 months). From January 2002 to September 2002, Nur did not have a job, so Lubis and Siregar only charged her $100 per month (although as discussed in the Sentencing Memorandum of the United States, the defendants required Nur to work for them without pay during this and other periods). By 2008, the defendants had increased the rent to $375 per month.

3

```
 9 months x $100 per month = $    900
61 months x $250 per month = $15,250
10 months x $300 per month = $ 3,000
 2 months x $ 375 per month = $    750
                             $ 19,900
```

This does not include the incidental fees and taxes Lubis and Siregar required of Nur. Also not included is Nur's free labor for Siregar and Lubis. From January 2002 to September 2002, Nur helped Siregar clean houses 3 days per week for about 4-5 hours per day. Siregar did not pay Nur for this work. When not working with Siregar, Nur worked with Lubis (usually at night) delivering parcels. Lubis also did not pay Nur for this work. Additionally, on Saturdays, Siregar would generally take four of the women, including Nur, to a home in Washington, DC, which they would clean. Siregar did not pay the women for this work. Also, before Turiah began assisting Lubis with his newspaper deliveries, Nur would assist him. Lubis never paid her for this work. Thus, the calculation above is again an extremely low estimate of the actual losses the victim sustained as a result of the defendants' criminal conduct, and an equally low estimate of the profit the defendants reaped from their scheme.

    4.    **Turiah Tarjuki ("Maria") ($ 25,730)**

The defendants held Turiah from May 2001 to October 26, 2008 (89 months). Turiah stated that when she began living with the defendants in 2001 "rent" for her was $280 per month but that increased to $375 by 2008.

```
56 months x $280 per month = $ 15,680
31 months x $300 per month = $  9,300
 2 months x  $375 per month = $    750
                              $ 25,730
```

Again, this total does not include incidental fees and taxes that the defendants collected.

Also, Turiah assisted Lubis on his paper route nearly every Sunday. She would usually get up at 3:00 A.M. and work until 7:00 or 8:00 A.M. Lubis never paid her for this. According to Turiah, Lubis delivers around 300 papers. On Mondays, Turiah also assists Siregar in cleaning houses in D.C., for which she was not paid.

    5.      **Heti Binti Pahru ("Endang") ($ 13,850)**

Lubis and Siregar held Endang from July 2005 to October 2008 (41 months). Initially "rent" was about $250 per month but by 2008 she was paying $350 per month, and in August 2008 she was paying $375 per month.

```
29 months x $250 per month = $  7,250
11 months x $350 per month = $  3,850
 2 months x $375 per month = $    750
                             $ 12,850
```

Additionally, Lubis and Siregar collected $1,000 from Endang, which they claimed to be holding for "travel expenses," and which they never returned to her. This makes a total of $ 13,850.

Again, this total does not include "taxes" and fees that Lubis and Siregar required the women to pay. Also not included is the free labor that Endang provided. During a two-month interval during the summer of 2005 when Endang was out of work, she helped Siregar clean houses 6 days per week for about 6 hours per day. Siregar never paid Endang for this work.

    6.      **Hanik Muflikhatin M. Noor ($ 13,190)**

Lubis and Siregar held Hanik from May 2006 to October 26, 2008 (30 months). Hanik said that she paid Lubis and Siregar $375 per month, but presumably she paid less in previous years. Below, Tini stated that she was paying $320 per month during this time frame, so the $320 figure is used to account for the period before the rent was raised to $375.

5

```
20 months x $250 per month = $ 8,640
8 months x $350 per month =  $ 2,800
2 months x $375 per month =  $   750
                             $12,190
```

Additionally, Lubis and Siregar collected $1,000 from Hanik, which they claimed to be holding for "travel expenses," and which they never returned to her. This makes a total of $13,190.

Again, this does not include other fees that were imposed or the free labor that Hanik provided. Hanik mentioned that on Saturdays Siregar would take Hanik, Endang, Nur, and Umi to the home of Alan Palmer, a Washington, D.C. attorney. The women would then work for approximately four to five hours cleaning the house and doing the Palmer's laundry. None of the women were paid for the work. This calculation also excludes Hanik's work when she came to live with Lubis and Siregar, in May 2006. Three days per week, for about four hours per day, she assisted Siregar in cleaning homes, and Siregar never paid Hanik for this work.

7.   **Umi Maskurotin ($ 4,200)**

Lubis and Siregar held Umi from November 2007 to October 26, 2008 (12 months). She started out paying $250 per month but this slowly increased until she was paying $375 per month by March 2008.

```
2 months x $250 per month = $   500
2 months x $350 per month = $   700
8 months x $375 per month = $ 3,000
                            $ 4,200
```

8.   **Supartini Katmo ("Tini") ($ 6,720)**

Lubis and Siregar held Tini from October 2004 to June 2006 (21 months). She paid the defendants $320 per month. 21 months x $320 per month = $6,720.

**C.    Coerced "Consent" is No Defense to Restitution**

While Lubis and Siregar may attempt to offset these amounts on the grounds that they provided housing and transportation to the victims, any such argument is without merit. Although the victims did reside in Lubis and Siregar's basement for approximately eight days per month, and although the defendants transported the victims to and from their basement to their respective employers' homes, this is not a defense to restitution. As the Sentencing Memorandum of the United States made clear, the victims resided in Lubis's basement only because Lubis and Siregar required them to reside there. But for this coercion and duress, the victims could have resided with the client families for whom they worked, which would have obviated the need to reside at the defendants' house on the weekends and obtain transportation from him.[4] This coercion left the victims with no reasonable alternative but to agree to pay Lubis. The defendants exacted significant sums from the victims for housing in crowded, restrictive conditions, only because the defendants demanded the victims participate in this scheme, not because the victims chose to reside in the defendants' basement.

Duress vitiates consent and makes any agreement made under duress voidable. Contempo Design, Inc., v. Chicago and N.E. Illinois Dist Council of Carpenters, 226 F.3d 535, 557 (7th Cir. 2000) ("If there was duress, then the contract is void."); Happ v. Corning, Inc., 466 F.3d 41, 44 (1st Cir. 2006). Lubis and Siregar's threats of deportation and threats of physical harm (including a

---

[4] As the United States noted in its Sentencing Memorandum, the family for whom Umi Maskurotin worked (the Blizzards) asked Umi to move to Florida with them. Umi liked the Blizzards and she wanted to move with them, but she declined the offer because Siregar had told Umi that she had to stay and work for Lubis and Siregar. Likewise, the family that purchased the Blizzards' residence also asked Umi to live with them and promised to sponsor her for a visa. In light of the defendants orders to reside at their home on the weekends, Umi could not accept this offer.

threat to kill Tini's family) left the victims with no choice but to reside in the defendants' basement on the weekends and to incur financial losses in the form of payments exacted from them by the defendants.

Because Lubis and Siregar demanded that the victims return to the defendants' basement and forbade the victims from using public transportation, the victims likewise had no choice but to acquiesce to the defendant's transportation of them. Because the defendants demanded payment for these "services," the victims had no reasonable alternative but to pay Lubis and Siregar. The payments were not voluntary and were based on fear of arrest, deportation, and physical harm. Accordingly, the payments were based on fear and were made under duress, and the victims are entitled to restitution for the amounts they so paid.[5]

Lubis and Siregar obtained numerous fees, purported "taxes," extensive amounts of uncompensated labor from the victims, all of which are excluded from the restitution calculations above. Such excluded amounts of losses are ample to account for any actual value the defendants might have conferred on the victims in exchange for the significant sums the defendants collected

---

[5] Furthermore, any contract that the victims had with the defendants involved harboring and transporting aliens unlawfully in the United States, both of which constitute violations of federal law. See 8 U.S.C. § 1324(a)(1)(A). As the Supreme Court has stated: "[C]ourts have uniformly held that contracts tending to encourage violation of laws are void as contrary to public policy." Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 710, 65 S. Ct. 895, 903, 89 L. Ed. 1296 (1945); Glaziers and Glassworkers Local Union No. 767 v. Custom Auto Glass Distributors, 689 F.2d 1339, 1343 (9th Cir. 1982) ("It is also well-established, however, that a federal court has a duty to determine whether a contract violates federal law before enforcing it . . . ."); see also Granados v. Windsor Development Corp., 509 S.E.2d 290, 291 (Va. 1999) (holding that an employment contract with an illegal alien was void an unenforceable). Thus, even if the defendants had not used coercion and duress, their agreements with the victims should not be sanctioned by this Court in light of the violation of federal law that the contracts necessarily contemplated.

from the victims. Thus, any attempt to offset or reduce the loss calculations above is devoid of merit, both because the victims were compelled to participate in the defendants' scheme and thus cannot properly be charged for receiving the "value" of housing and transportation that they did not choose to receive, and because the calculations are already substantially reduced by omitting the additional charges and free labor the defendants collected from the victims.

**D.     Conclusion**

For the reasons set forth above, the Government respectfully moves the Court to impose an order holding the defendants jointly and severally liable for restitution in amounts calculated above.

Respectfully submitted,

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY


By:   /s/
James P. Gillis
Assistant United States Attorney
Michael J. Frank
Trial Attorney
Civil Rights Division
United States Department of Justice

**Certificate of Service**

I hereby certify that on June 30, 2009, I electronically filed the MEMORANDUM OF THE UNITED STATES WITH RESPECT TO RESTITUTION with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Mr. Kevin Brehm
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22231
kevin_brehm@fd.org
Attorney for Soripada Lubis

Robert F. Horan, III
Hart & Horan, P.C.
10505 Judicial Drive, Suite 101
Fairfax, VA 22030
Robertfhoran@verizon.net
Attorney for Siti Chadidjah Siregar

/s/
James P. Gillis